WISCONSIN REALTORS ASSOCIATION, Wisconsin Education Association Council, Wisconsin Manufacturers and Commerce, Wisconsin Grocers Association, Wisconsin Builders Association, Wisconsin Broadcasters Association (Seventh Claim for Relief), Wisconsin Farm Bureau Federation, Realtors–PAC, WEAC–PAC, WMC Issues Mobilization Council, Inc., all for themselves and their individual members including David L. Mays, Thomas A. Bindl and Tamara Schindler, Plaintiffs,

v.

Steven V. PONTO, chairperson of the Wisconsin State Elections Board; and each of its members, Daniel D. Blinka, David Halbrooks, Patrick J. Hodan, Brenda Lewison, John P. Savage, John C. Schober, Jeralyn Wendelberger and Kevin J. Kennedy, its executive director; Jack C. Voight, State Treasurer of Wisconsin; and Richard G. Chandler, secretary of the Wisconsin Department of Revenue, each in his or her official capacity, Defendants.

No. 02–C–424–C.

United States District Court, W.D. Wisconsin.

Dec. 11, 2002.

Brady C. Williamson, La Follette, Godfrey & Kahn, S.C., Madison, WI, for Plaintiffs Thomas A. Bindl, David L. Mays, Realtors–PAC, Tamara Schindler, WEAC–PAC, Wisconsin Broadcasters Association, Wisconsin Builders Association, Wisconsin Education Association, Wisconsin Farm Bureau Federation, Wisconsin Grocers Association, Wisconsin Manufacturers and Commerce, Wisconsin Realtors Association, WMC Issues Mobilization Council.

Marilyn Mohrman–Gillis, Washington, DC, for Plaintiffs Association of Public Television, National Educational Telecommunication.

Wilbur Hinton, Columbia, SC, for Plaintiff Organization of State Broadcasting.

William J. Mulligan, Davis & Kuelthau, S.C., Milwaukee, WI, for Defendants Daniel D. Blinka, Richard G. Chandler, David Halbrooks, Patrick J. Hodan, Kevin J. Kennedy, Brenda Lewison, Steven V. Ponto, John P. Savage, John C. Schober, Jack C. Voight, Jeralyn Wendelberger.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief brought pursuant to 42 U.S.C. § 1983. Jurisdiction is present. 28 U.S.C. § 1331. Plaintiffs contend that several provisions of Wisconsin's new campaign finance law are unconstitutional and have moved for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). Although in their complaint plaintiffs challenge eight individual provisions of the new law, their Rule 12 motion is limited to three provisions. Two of these relate to advertisements featuring candidates for public office that appear in close proximity to state elections. They are part and parcel of an overarching legislative scheme for reforming the financing of state election campaigns and are subject to a sweeping non-severability clause. Accordingly, if either provision is struck down on constitutional grounds, the entire reform package is void with one exception. The third provision requires the promulgation of rules obligating public broadcasters to provide free air time to state candidates. This provision is not subject to the non-severability clause and for that reason, its fate is not linked to the constitutionality of any other statutory provision. Rather, it must stand or fall according to its own legal merits.

I conclude that plaintiffs have not shown the facial unconstitutionality of the new law's provisions imposing certain disclosure requirements and prohibiting the use of corporate treasury funds on communications featuring a candidate within 60 days of an election. As it stands, the record is not sufficiently developed to make such a determination. However, plaintiffs are entitled to judgment on the pleadings on their challenge to the constitutionality of the new law's provision requiring *prior* disclosure of communications featuring a candidate within 30 days of an election.

That provision flatly prohibits any independent group from mentioning a candidate within 30 days of an election if the group has not disclosed to the government its intentions to do so no later than the 31st day before the election. This provision is not supported by a significant government interest and is not narrowly tailored, rendering it incompatible with the First Amendment. By virtue of the new law's non-severability clause, this provision's constitutional infirmity renders nearly all the new law's campaign finance provisions void, including the provisions regulating communications appearing within 60 days of an election and the other provisions that plaintiffs have challenged in this suit but that are not at issue on their motion for judgment on the pleadings. Finally, I conclude that federal law does not preempt the new law's public broadcasting provision, which is not subject to the non-severability clause, and that I cannot hear plaintiffs' First Amendment challenge to the requirement that the Elections Board promulgate rules requiring public broadcasters to provide a minimum amount of free air time to state candidates because it is not ripe for judicial review.

For the sole purpose of deciding plaintiffs' motion, I find from the pleadings that plaintiffs have alleged the following facts.

## FACTS

On July 26, 2002, Governor Scott McCallum signed into law a state budget bill, 2001 Wisconsin Act 109. The bill contained numerous provisions concerning the financing of state election campaigns. The effective date of the new campaign finance provisions is July 1, 2003. This action challenges several of those provisions and the changes they wrought in Wisconsin's campaign finance law.

### A. *Parties*

Plaintiffs are organizations, individual members of those organizations and two political action committees connected with the organizations that are active in Wisconsin politics. Organizational plaintiffs Wisconsin Realtors Association, Wisconsin Education Association Council, Wisconsin Manufacturers and Commerce, Wisconsin Grocers Association, Wisconsin Builders Association and Wisconsin Farm Bureau Federation each take public positions on issues of public interest and concern, including publicly endorsing or opposing candidates for state office. In addition, some plaintiffs periodically spend corporate funds to purchase broadcast and other advertising to express their positions on public issues and to comment publicly on candidates for state public office. The individual plaintiffs are members of the plaintiff organizations and are citizens, taxpayers and voters. Plaintiff David L. Mays is a realtor and a member of plaintiff Wisconsin Realtors Association's public policy committee. Plaintiffs Thomas A. Bindl and Tamara Schindler are teachers and members of plaintiff WEAC–PAC's board. As members of the plaintiff organizations, the individual plaintiffs associate with other citizens who share their positions on public issues and candidates and, through the plaintiff organizations, express their collective opinion on matters of public interest and concern, including candidates for state public office. Plaintiffs WEAC–PAC and Realtors–PAC are political action committees registered with the state of Wisconsin. Plaintiff WMC Issues Mobilization Council, Inc. is a non-stock Wisconsin corporation organized under section 501(c)(4) of the Internal Revenue Code. It was formed to advance a business agenda through issue advocacy communication on behalf of plaintiff Wisconsin Manufacturers and Commerce and its members. Plaintiff Wisconsin Broadcasters Associa-

tion is composed of individuals, partnerships and other entities and was formed to advance the interests of radio and television broadcast stations in the state. It challenges only the free air time public broadcast provisions at issue in this litigation.

Defendant Steven V. Ponto is chairperson of the Elections Board of the state of Wisconsin. Defendants Daniel D. Blinka, David Halbrooks, Patrick J. Hodan, Brenda Lewison, John P. Savage, John C. Schober and Jeralyn Wendelberger are members of the Elections Board. Defendant Kevin J. Kennedy is the Election Board's executive director and, pursuant to Wis. Stats. § 5.05(1)(a), is the state's chief election officer. The Elections Board has general authority over and responsibility for administering the state's laws relating to elections and election campaigns. Defendant Jack C. Voight is Wisconsin Treasurer and is charged under the new law with overseeing the distribution of funds to candidates under the state's public financing program both directly and through the Republican Party of Wisconsin, the Democratic Party of Wisconsin and the Elections Board. Defendant Richard G. Chandler is Secretary of the Wisconsin Department of Revenue and is responsible for collecting funds that will be transferred to candidates participating in the public financing program through the Wisconsin Election Campaign Fund. Chandler is also responsible for overseeing the implementation and administration of the campaign fund tax check-off.

### B. *2001 Wis. Act 109*

#### 1. *Sections 1ucj and 1ty*

Section 1ucj of the Act creates a new statutory section, Wis. Stat. § 11.12(6)(am), that imposes registration and reporting requirements on certain committees that make disbursements in excess of $250 cumulatively for communications that are for a "political purpose."

Section 1ty of the Act amends the definition of "political purpose" found in Wis. Stat. § 11.01(16)(a) to include a "communication . . . that is made during the period beginning on the 60th day preceding a general, special, or spring election and ending on the date of that election and that includes a reference to or depiction of a clearly identified candidate. . . ." In addition, Wis. Stat. § 11.01(7) ties the definition of "disbursement" to the definition of "political purpose" and Wis. Stat. § 11.38 provides that no "foreign or domestic corporation, or association . . . may make any . . . disbursement, directly or indirectly, either independently or through any political party, committee, group, candidate or individual for any purpose other than to promote or defeat à referendum."

#### 2. *Section 1uck*

Section 1uck of the Act creates Wis. Stat. § 11.12(6)(c). The new section prohibits certain committees from making any disbursements or incurring any obligations for communications for a political purpose "during the period beginning on the 30th day preceding a general, special, or spring election and ending on the date of that election" unless a report has been filed "no later than the 31st day preceding the general, special, or spring election to which the report relates." The report must be filed with the Elections Board. In addition, it must be filed "with each candidate whose name is certified to appear on the ballot for the office in connection with which the communication is made" and with "the political party under whose name each such candidate appears on the ballot, if any." The reports "shall indicate the name of each candidate who will be supported or whose opponent will be opposed and the total disbursements to be made and obligations incurred for such a purpose with regard to that candidate during the period covered by the report."

### 3. *Section 1udj*

Section 1udj of the Act creates Wis. Stat. § 11.21(17). It directs the Elections Board to promulgate "rules that require public access channel operators and licensees of public television stations in [Wisconsin] to provide a minimum amount of free time on public access channels and public television stations to . . . candidates for state office on the ballot at general, spring, or special elections." The same amount of time must be offered to each candidate for a particular state office. Different amounts of time may be offered to candidates for different offices.

### 4. *Non-severability*

With the exception of the new campaign finance provision requiring the promulgation of rules obligating public broadcasters to provide free air time to state candidates, a non-severability provision in the budget bill requires the invalidation of *all* of the new campaign finance provisions if a court finds *any* provision unconstitutional. If only the broadcast provision is invalidated, the law allows the other campaign finance provisions to remain in effect. Conversely, if the other campaign finance provisions are invalidated, but the broadcast provision survives constitutional scrutiny, the broadcast provision will remain in effect.

### OPINION

Plaintiffs have moved for judgment on the pleadings with respect to three of the eight claims advanced in their complaint. Specifically, plaintiffs argue that the changes made to Wisconsin's campaign finance law by sections 1ucj, 1uck and 1udj of 2001 Wis. Act 109 are inconsistent with the First and Fourteenth Amendments to the United States Constitution. In addition, plaintiffs maintain that section 1udj of the Act is preempted by federal law. The parties agree that if either section 1ucj or 1uck is deemed unconstitutional, then all the campaign finance amendments contained in 2001 Wis. Act 109, including those not directly at issue on plaintiff's Rule 12(c) motion, are automatically void by operation of the bill's non-severability clause. *See* 2001 Wis. Act 109, § 9115(2y)(b). The only exception to this sweeping non-severability clause is section 1udj and its public broadcasting provisions.

Fed.R.Civ.P. 12(c) provides that once "the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." The pleadings include any written instruments attached to the complaint or answer as exhibits. *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452 (7th Cir.1998) (citing Fed.R.Civ.P. 10(c)). Plaintiffs have appended a copy of 2001 Wis. Act 109 to their complaint. To succeed on their Rule 12(c) motion, plaintiffs bear the burden of demonstrating that there are no material issues of fact to be resolved. *See id.* The allegations of the complaint are viewed in the light most favorable to defendants because they are the non-moving party. *See Delgado v. Jones,* 282 F.3d 511, 515 (7th Cir.2002). However, defendants cannot simply rest on unsupported conclusions of law. *City of South Bend,* 163 F.3d at 452. Ultimately, judgment on the pleadings is appropriate only if plaintiffs are entitled to judgment as a matter of law. *See* 2 *Moore's Federal Practice,* § 12.38 (Matthew Bender 3d ed.).

### A. *Express Advocacy and Issue Advocacy*

Section 1ty of 2001 Wis. Act 109 amends the definition of "political purpose" found at Wis. Stat. § 11.01(16). The amended definition identifies a communication "that is made during the period beginning on the 60th day preceding a[n] . . . election and ending on the date of that election and that includes a reference to . . . a clearly

identified candidate," as one made for a political purpose. According to plaintiffs, this definition leads to two significant problems. First, section 1ucj of the Act imposes new disclosure and reporting requirements on groups making communications for a political purpose. Plaintiffs maintain that the statutory scheme established by the Act is unconstitutional on its face because the First Amendment prohibits any regulation of communications merely because they contain a reference to a clearly identified candidate and appear within 60 days of an election. It is unconstitutional to regulate on the basis of these criteria alone, plaintiffs argue, because the First Amendment countenances regulation of only those communications that contain express words advocating the election or defeat of a candidate. Second, because the definition of "disbursement" found in Wis. Stat. § 11.01(7) is tied to the definition of "political purpose," expenditures for advertisements that refer to a clearly identified candidate within 60 days of an election qualify as disbursements, which corporations are flatly prohibited from making by virtue of Wis. Stat. § 11.38 (prohibiting corporations from making any "disbursement, directly or indirectly, either independently or through any political party, committee, group, candidate or individual"). Plaintiffs maintain that with very limited exceptions, this amounts to a total ban on corporate communications that refer to a candidate during the 60 day period before an election, a state of affairs that cannot be squared with the First Amendment. Defendants argue that plaintiffs have failed to demonstrate that the Act's disclosure requirements and its limits on certain corporate communications are facially invalid or otherwise inconsistent with controlling Supreme Court precedent.

■ The parties' arguments revolve around the concept of "express advocacy." Generally speaking, communications that expressly advocate the election or defeat of a candidate are a permissible subject of government regulation. By contrast, those communications that do not contain express advocacy are exempt from governmental control and are generally referred to as issue advocacy. Indeed, plaintiffs point out that this court has observed previously that spending and contribution limits and reporting requirements can be imposed only on organizations engaged in express advocacy. *See Wisconsin Manufacturers & Commerce v. State of Wisconsin Elections Board,* 978 F.Supp. 1200, 1205 (W.D.Wis.1997). But that observation merely begs the question; it assumes that the term "express advocacy" is properly defined. It remains to be determined whether the Wisconsin legislature's effort to regulate advertisements that appear within 60 days of an election and feature a clearly identified candidate falls within or without the outer boundaries of that concept.

The Supreme Court first articulated the express advocacy test over a quarter century ago in *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In that case, the Court considered a provision of the Federal Election Campaign Act that limited the amount of money most individuals and groups could spend independently to voice their views "relative to" a clearly identified candidate. Recognizing that the "use of so indefinite a phrase as 'relative to' a candidate" would render the provision unconstitutionally vague, the Court construed the provision to apply "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 41, 44, 96 S.Ct. 612. In a footnote, the Court noted that "this construction would restrict the application of [the provision] to communications containing express words of advocacy of election or defeat, such as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Con-

gress,' 'vote against,' 'defeat,' 'reject.'" *Id.* at 44, n. 52, 96 S.Ct. 612. These phrases have come to be known as the "magic words," because communications that contain them undoubtedly qualify as express advocacy. Similarly, another provision of the federal Act required individuals and groups to disclose expenditures made "for the purpose of influencing" the election of candidates for federal office. In the Court's view, this language also. raised flags because it was vague. *Id.* at 77, 96 S.Ct. 612. As it had with the Act's independent expenditure provision, the Court construed the disclosure requirements to "reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. 612.

Defendants accuse plaintiffs of seeking to inhibit Wisconsin's ability to protect the integrity of its electoral processes and provide its electorate with information about the source of state candidates' financial support by limiting permissible regulation to those communications containing one of the handful of phrases found in *Buckley's* footnote 52. Plaintiffs point out that this misstates their position. They agree that the magic words "are clearly *not* the only words that can be considered express advocacy" and that the list established in *Buckley* is merely illustrative, rather than exhaustive. Plts.' Reply Br. in Supp. of Mot. for J. on the Pleadings, dkt. # 39, at 8, n. 8. Nevertheless, plaintiffs maintain that even "putting aside the scope of *Buckley's* footnote 52, [a communication] still must use *some* words [of advocacy] . . . to be regulated," and that the approach taken by the Wisconsin legislature contravenes this mandate because it relies "only on a temporal requirement and, therefore, deem[s] express advocacy *all* advertisements that contain a reference to a candidate within 60 days of an election." *Id.* at 9, 10. According to plaintiffs, *Buckley* conclusively establishes that the legisla-

ture's approach cannot be squared with the First Amendment. However, I conclude that plaintiffs have failed to demonstrate that they are entitled to judgment on the pleadings on this issue.

Plaintiffs argue repeatedly that the regulatory approach adopted by the Wisconsin legislature violates the Constitution because it deviates from the narrowing construction imposed by the Supreme Court on certain provisions of the Federal Election Campaign Act in *Buckley*. In other words, plaintiffs' argument hinges on the notion that in narrowly construing language in the federal Act to save it from invalidation on vagueness grounds, the Court carved in constitutional stone a standard that governs forever all state efforts to regulate independent political communications. The procedural posture of this case demands this characterization of plaintiffs' argument. Because this case is before the court on plaintiffs' motion for judgment on the pleadings, defendants have not been given any opportunity to present facts addressing the legislature's interests in amending its campaign finance laws in response to campaign practices that have developed and evolved in the decades since *Buckley* was decided. Nor have defendants had an opportunity to develop evidence demonstrating that in light of modern campaign practices the amended law was tailored to avoid an impermissibly broad sweep. Therefore, plaintiffs can succeed on their motion only if *Buckley* is the final constitutional word on the proper definition of express advocacy.

Unlike plaintiffs, I am not convinced that *Buckley* was intended to work such a significant inhibition on future legislative efforts to address problems raised by the competing state interests and constitutional imperatives inevitably associated with express and issue advocacy. In *Buckley*, the Court was applying the "well-estab-

lished principle that statutes will be interpreted to avoid constitutional difficulties," *Frisby v. Schultz*, 487 U.S. 474, 483, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988), rather than establishing an unalterable principle of constitutional law. Indeed, this court has previously noted that in *Buckley*, the Supreme Court "stopped short of grounding [the express advocacy test] in the Constitution, explaining instead that it was crafted to avoid constitutional problems." *Wisconsin Manufacturers & Commerce*, 978 F.Supp. at 1205; *see also National Federation of Republican Assemblies v. United States*, 218 F.Supp.2d 1300, 1325 (S.D.Ala.2002) (plaintiffs erred in insisting "that *Buckley* held that all political speech other than express electoral advocacy lies beyond the reach of constitutional regulation." Rather, in *Buckley*, the Court articulated "an express electoral advocacy benchmark in order to *avoid* deciding the permissible" outer boundaries of regulation.) Other courts have recognized that *Buckley* does not preclude legislative innovation in this area. *See Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379 (4th Cir.2001) ("If change [in the meaning of express advocacy] is to come, it must come *from an imaginative Congress* or from further review by the Supreme Court.") (emphasis added); *Elections Board v. Wisconsin Manufacturers & Commerce*, 227 Wis.2d 650, 680, 597 N.W.2d 721, 736 (1999) ("[C]reation of [a new standard of express advocacy] is properly *the role of the legislature* and the [Elections] Board.") (emphasis added).

Moreover, the narrowing construction adopted in *Buckley* was driven substantially by vagueness concerns. A prospective speaker could never know with any certainty whether a particular communication would later be deemed by a regulator to be "relative to" a particular candidate or "for the purpose of influencing" a given election, a state of affairs that would " 'compel the speaker to hedge and trim.' " *Buckley*, 424 U.S. at 43, 96 S.Ct. 612 (quoting *Thomas v. Collins*, 323 U.S. 516, 535, 65 S.Ct. 315, 89 L.Ed. 430 (1945)). Whatever the potential constitutional flaws of Wisconsin's new reporting and disclosure scheme, vagueness does not appear to be one of them. In fact, the state legislature's approach appears to draw a line even brighter than the one established in *Buckley*. The law makes clear that once a certain dollar threshold is surpassed, the law's disclosure requirements apply to any communication referring to a clearly identified candidate that appears within 60 days of an election. A copy of a proposed advertisement and a calendar are all that is necessary to make a conclusive advance determination that the ad is subject to regulation. By contrast, the *Buckley* approach to express advocacy still leaves room for a degree of uncertainty because, as plaintiffs concede, the list of words and phrases identified in that opinion as constituting express advocacy is illustrative, rather then exhaustive. Therefore, in a later case involving the federal statute at issue in *Buckley*, the Court noted that the definition of express advocacy it adopted in *Buckley* would also cover a communication whose message "is marginally less direct than 'Vote for Smith.' " *Federal Election Commission v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 249, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986). Just how "direct" an exhortation must be to qualify as express advocacy under *Buckley* is not free of all uncertainty for would-be political advertisers.

Although the new law's approach to express advocacy does not appear to be susceptible to a vagueness challenge, plaintiffs maintain that the "statute gives new and frightening meaning to the notion of overbreadth." They argue that "the challenged provision is not narrowly tailored and . . . its overbreadth would lead to the

regulation of communications that even the defendants would refer to as 'pure issue advocacy.'" Plts.' Reply Br. in Supp. of Mot. for J. on the Pleadings, dkt. # 39, at 17. Plaintiffs' overbreadth challenge raises serious questions about the constitutional viability of the legislature's temporal approach to defining express advocacy. Even if *Buckley* did not establish *the* definitive test for determining what types of political communications are subject to regulation, it recognized that "groups engaged purely in issue discussion" were beyond the reach of regulators. *Buckley*, 424 U.S. at 79, 96 S.Ct. 612. Plaintiffs contend that, unlike the *Buckley* test, the legislature's temporal approach will inevitably regulate a substantial amount of such pure issue discussion.

■ "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 122 S.Ct. 1389, 1399, 152 L.Ed.2d 403 (2002). The overbreadth doctrine prevents governmental regulation of unprotected speech "if a substantial amount of protected speech is prohibited or chilled in the process." *Id.* at 1404. As this formulation suggests, if a facial overbreadth challenge is to succeed, "'it is not enough for a plaintiff to show some overbreadth.' Rather, 'the overbreadth of a statute must not only be real, but substantial as well.'" *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 122 S.Ct. 1700, 1713, 152 L.Ed.2d 771 (2002) (citations omitted). Therefore, to prevail, a plaintiff "must demonstrate that the challenged law 'could never be applied in a valid manner,'" *New York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (citations omitted), or that the statute "reaches a substantial number of impermissible applications." *New York v. Ferber*, 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Gen-

erally speaking, the overbreadth doctrine is "strong medicine" to be employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). The question presented here is whether the legislature's temporal approach to requiring disclosure of funds used to pay for ads featuring candidates is narrowly tailored or, on the other hand, if it clearly reaches a substantial amount of pure issue discussion. I conclude that this question cannot be answered on the record as it now exists.

In *Buckley*, 424 U.S. at 67, 96 S.Ct. 612, the Court recognized the compelling governmental interests served by campaign finance disclosure requirements, noting that the "sources of a candidate's financial support ... alert the voter to the interests to which a candidate is most likely to be responsive and thus facilitate predictions of future performance in office." The Court also recognized the government's compelling interest in avoiding corruption or the appearance of corruption in the electoral process. *See id.* at 27, 96 S.Ct. 612. Defendants contend that by paying for political advertisements that assail a candidate on the eve of an election, groups can curry favor with the candidate's opponent in much the same way as if they had written the opponent a sizable check. Thus, they argue, these ads bring into play the government's interests in disclosure and avoiding the appearance of corruption whether or not they contain express words of advocacy. Moreover, defendants maintain that it is precisely these type of ads that have flooded the airwaves in recent election cycles. Plaintiffs respond that even assuming defendants can demonstrate a compelling interest, the relevant provisions of the new law remain overly broad because they would subject to regulation even those ads genuinely concerned with issues, such as an advertisement in

the month before an election urging a governor to sign a piece of pending legislation.

■ This presents a difficult question that is made more difficult by the procedural posture of this case. Because plaintiffs have moved for judgment on the pleadings, neither party has had the opportunity to present any factual evidence to the court. However, a plaintiff challenging a statute on the ground that it is overly broad must "demonstrate from the text of [the statute] *and from actual fact* that a substantial number of instances exist in which the [statute] cannot be applied constitutionally." *New York State Club Ass'n*, 487 U.S. at 14, 108 S.Ct. 2225 (emphasis added). It would be premature to declare the new law's express advocacy provisions unconstitutional without providing the parties some opportunity to develop evidence of the character of the actual communications that are likely to be regulated and their relationship to the state's interest in enhancing disclosure and avoiding corruption. *See, e.g.,* Richard L. Hasen, *Measuring Overbreadth: Using Empirical Evidence to Determine the Constitutionality of Campaign Finance Laws Targeting Sham Issue Advocacy,* 85 Minn. L.Rev. 1773, 1783 (2001) ("[T]he question of substantial overbreadth involves a *comparative* effort; one looks at the proportion of overbroad applications of the statute compared to legitimate ones."). Without considering any evidence of the state's recent experience in conducting elections and the character of ads featuring candidates that appear in the 60 days before an election, I cannot conclude as a matter of law that the state's regulatory scheme would reach a substantial number of communications so attenuated from elections as to render all regulation constitutionally impermissible. "The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of

the justification raised." *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 391, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). The state's approach to express advocacy is novel. The state may well face an uphill battle in marshaling the evidence necessary to withstand an overbreadth attack, but I cannot say without question that the state is destined to lose that battle.

This conclusion is not altered by plaintiffs' second attack on the new law's bright-line approach to express advocacy. In Wisconsin, as under federal law, corporations are prohibited from spending any money, independently or otherwise, on express advocacy. *See* Wis. Stat. § 11.38. By defining any communication that features a candidate and appears within 60 days of an election as express advocacy, the new law effectively prohibits all advertisements within that time frame that are paid for with corporate treasury funds and mention a candidate. A corporation's only option would be to form a separate segregated fund, or "political action committee," and submit to the array of regulations applicable to such entities. *See* Wis. Stat. § 11.38(1)(a)2. Plaintiffs point out that this is a significant restriction on corporate speech, particularly given the Supreme Court's recognition that the "inherent worth of ... speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union or individual." *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 777, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Nevertheless, the Court has also recognized that corporate participation in campaigns poses special problems that may justify government regulation.

State law grants corporations special advantages—such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of

assets—that enhance their ability to attract capital and to deploy their resources in ways that maximize the return on their shareholders' investments. These state-created advantages not only allow corporations to play a dominant role in the Nation's economy, but also permit them to use 'resources amassed in the economic marketplace' to obtain 'an unfair advantage in the political marketplace.'

*Austin v. Michigan Chamber of Commerce,* 494 U.S. 652, 658–59, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990) (quoting *Massachusetts Citizens for Life,* 479 U.S. at 257, 107 S.Ct. 616). Therefore, state regulation of corporate campaign spending is justified by "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Id.* at 660, 110 S.Ct. 1391.

Plaintiffs note that the state statute upheld in *Austin* applied only to the use of general corporate treasury funds to pay for express advocacy within the meaning of *Buckley,* while the law at issue here reaches corporate expenditures on issue advocacy. Of course, this argument depends on the notion that *Buckley* established an inflexible and unalterable definition of express advocacy and I have concluded that it did not. It remains to be determined whether the legislature's temporal approach to defining express advocacy is fatally overbroad, but as explained earlier, that is a determination I cannot make on a motion for judgment on the pleadings. If defendants can show that the bulk of corporate-funded ads featuring candidates and appearing in the 60 days before an election raise the concerns associated with "political war chests funneled through the corporate form," *FEC v. National Conservative PAC,* 470 U.S. 480, 500–01, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985), the reg-

ulation may prove to be narrowly tailored and supported by compelling governmental interests.

Finally, plaintiffs note that several federal courts have struck down regulations on political communications appearing in close proximity to an election that are strikingly similar to the provisions at issue here. *See, e.g., Vermont Right to Life Committee, Inc. v. Sorrell,* 221 F.3d 376, 386 (2d Cir.2000). But these cases rely largely on the uncritical assumption that the Court announced an unalterable principle of substantive First Amendment law in *Buckley. See West Virginians for Life, Inc. v. Smith,* 919 F.Supp. 954, 959 (S.D.W.Va.1996) (criticizing "the West Virginia Legislature [for] attempt[ing] to change the definition of express advocacy laid down by the United States Supreme Court"); *contra Wisconsin Manufacturers & Commerce,* 227 Wis.2d at 680, 597 N.W.2d at 736 (the "creation of [a new standard of express advocacy] is properly *the role of the legislature* and the [Elections] Board") (emphasis added); *National Federation of Republican Assemblies,* 218 F.Supp.2d at 1325. Instead, in *Buckley,* the Court imposed a narrowing construction appropriate to the particular statute before it in order to avoid constitutional problems of vagueness and overbreadth. The Wisconsin legislature's approach to regulation differs greatly from that taken by Congress in the Federal Election Campaign Act, which was the statute before the Court in *Buckley,* by, for example, adopting a bright-line approach to avoid vagueness problems. Therefore, whether Wisconsin's approach to express advocacy is constitutionally infirm cannot be determined as a matter of law by mere reference to *Buckley.* Moreover, the cases cited by plaintiffs were decided on the basis of a more fully developed record than is the case here. *See, e.g., Right to Life of Michigan, Inc. v. Miller,* 23 F.Supp.2d

766, 769 (W.D.Mich.1998) ("Samples of Plaintiff's communications published within 45 days of elections reveal that a wide range of topics that have previously been discussed would be prohibited."). Accordingly, I am not persuaded that plaintiffs are entitled to judgment on the pleadings that 2001 Wis. Act. 109 §§ 1ty and 1ucj are unconstitutional on their face.

### B. *Prior Reporting Requirements*

Section 1uck of 2001 Wis. Act 109 prohibits any independent group from making a communication featuring a candidate within 30 days of an election unless it has filed a report detailing "the name of each candidate who *will be* supported or whose opponent *will be* opposed and the total disbursements *to be* made." (Emphasis added). This provision's use of the future tense is significant. Unlike section 1ucj, which requires groups to disclose their spending immediately *after* the disbursement of funds, section 1uck requires disclosure *before* a communication is made. In other words, any group wishing to run an advertisement featuring a candidate at any time during the 30 days before an election must detail its intentions to the government no later than the 31st day before the election. Failure to do so results in a flat prohibition on airing any ads featuring a candidate within the final 30 days of a campaign. For instance, section 1uck would forbid political action committees from airing such ads unless they had reported their plans to the government a month before the election, despite the fact that these committees must raise their money in accordance with Wisconsin's panoply of contribution limitations, source prohibitions and disclosure requirements. The advance notice requirement is inflexible, admits no exceptions and, according to plaintiffs, establishes a system of prior restraints of speech in violation of the First Amendment. As discussed below, whether section 1uck is classified appropriately as a prior restraint is a surprisingly difficult question, but the decision whether it is constitutional is less complicated. The record does not need further development to conclude that section 1uck is unconstitutional on its face.

■ Defendants argue first that section 1uck does not establish a system of prior restraints. They maintain that "prior restraints have been held to exist only where there is a direct restraint on speech" and that generally "that restraint takes the form of a court order enjoining speech activity." Dfts.' Mem. of Law in Opp'n to Plts.' Mot. for J. on the Pleadings, dkt. # 38, at 28. To the contrary, prior restraints are not limited to court orders enjoining speech. For instance, a government regulation requiring a would-be speaker to obtain a permit or pay a fee before engaging in public expression may be a prior restraint. *See Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992). The Supreme Court has stated that in determining whether a particular regulation is a prior restraint, the "relevant question is whether the challenged regulation *authorizes* suppression of speech in advance of its expression." *Ward v. Rock Against Racism,* 491 U.S. 781, 795 n. 5, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (emphasis in original); *Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975) (prior restraints are those regulations that give "public officials the power to deny use of a forum in advance of actual expression"). Section 1uck appears to fit that bill because it requires the suppression of speech in advance of its expression during the thirty days before an election if a speaker fails to disclose various information, including the subject of the intended speech, no later than the 31st day before the election.

Nevertheless, the Court of Appeals for the Seventh Circuit has noted recently that prior restraint analysis is appropriately reserved for regulations that raise the prospect of traditional content-based censorship, where government officials "prevent the dissemination of ideas or opinions thought dangerous or offensive," rather than for content-neutral permit or licensing schemes that carry with them the potential to limit free expression. *Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir.2001). The latter regulations are "reviewed under the much more permissive standard applicable to restrictions on the time, place, or manner of expression." *Id.* For instance, in *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 999–1000 (7th Cir.2002), the court of appeals considered a licensing registration requirement applicable to sexually-oriented businesses that required applicants to disclose a variety of personal information. Although characterizing the required disclosures as prior restraints, the court of appeals analyzed them as time, place or manner restrictions. *Id.* ("[T]he prior restraints in this case are constitutionally legitimate if they are proper time, place, or manner restrictions."). The regulation at issue here is not a prior restraint in the traditional sense, in that there is no censor scrutinizing advertisements that mention a candidate close to an election to assess "their dangerousness, offensiveness, immorality, and so forth." *Thomas v. Chicago Park District*, 227 F.3d 921, 924 (7th Cir.2000). Therefore, I will analyze section 1uck as a time, place or manner restriction. Such restrictions must be narrowly tailored to serve a significant government interest unrelated to the suppression of free expression. *See Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984); *Pleasureland*, 288 F.3d at 1000.

■ Section 1uck is not narrowly tailored to serve a significant government interest. Defendants maintain that "[d]isclosure laws perform the important function of deterring actual corruption and avoiding the appearance of corruption." This is true, *see Buckley*, 424 U.S. at 67, 96 S.Ct. 612, but defendants never explain why *prior* reporting requirements are necessary to prevent corruption, as opposed to the less onerous post-spending disclosure requirements upheld in *Buckley*. In the absence of a significant government interest, "a requirement that one must register *before* he undertakes to make a public speech ... is quite incompatible with the requirements of the First Amendment." *Thomas v. Collins*, 323 U.S. 516, 540, 65 S.Ct. 315, 89 L.Ed. 430 (1945) (emphasis added). It is not enough simply to invoke the general desire to avoid corruption or its appearance without explaining how section 1uck furthers that goal. Defendants cannot stave off judgment on the pleadings by relying on unsupported conclusions of law. *See City of South Bend*, 163 F.3d at 452. Moreover, section 1uck's prior reporting obligation applies to groups such as political action committees that are already subject to significant disclosure requirements and that are substantially regulated by the state in terms of the size and source of contributions they may lawfully make and accept. *See, e.g.*, Wis. Stat. §§ 11.05; 11.06; 11.26 and 11.38. Defendants do not explain why these existing regulations are insufficient to prevent corruption, making prior disclosure requirements necessary.

The real aim of section 1uck appears to be, as defendants candidly put it, to "prevent the 'ambush' of candidates by special interest groups." Dfts.' Mem. of Law in Opp'n to Plts.' Mot. for J. on the Pleadings, dkt. # 38, at 28. An "ambush" is a "surprise attack by people lying in wait in a concealed position." *New Oxford Amer-*

*ican Dictionary* 49 (2001). It is difficult to understand how that definition fits a political action committee that airs an advertisement in the weeks before an election touting a candidate it supports or attacking a candidate it opposes. Can ads that comment on a candidate's record in the run-up to an election be deemed genuinely surprising? At best, defendants' ambush argument suggests that candidates are peculiarly entitled to advance access to information that might affect their campaigns. At worst, as plaintiffs contend, section 1uck is intended to undermine the effectiveness of independent political activity by allowing candidates to obtain advance warning of the advertising strategies of groups who oppose them. Such a purpose is arguably not "unrelated to the suppression of free expression." *Pleasureland,* 288 F.3d at 1000. In any case, defendants point to no authority suggesting that helping candidates respond to an "ambush" in the form of ads that mention them in the last month of an election is a significant government interest and I am aware of none.

Section 1uck is also flawed because it is not narrowly tailored. Groups must declare their spending plans 31 days before election day. No exception is made to take into account the volatile and fluid nature of election campaigns. It takes little imagination to conceive of the problems such a provision might create. A candidate might drop out of a race, only to reenter it after the deadline has passed for groups to declare their spending plans. Recent history suggests that such a scenario is not implausible. *See, e.g.,* Mike Dennison, *Battleground Race Wandered Through Strange Territory,* Great Falls Tribune, November 3, 2002, at E1 (documenting Montana candidate's decision to drop out of senate race in October only to reenter it 12 days later); *The Road to the White House,* Wash. Times, October 28, 1992, at G2 (documenting Ross Perot's

July exit and October return to the 1992 presidential race). Or a new candidate might be nominated to replace a candidate who has died or withdrawn from a race after the disclosure deadline has passed. *See, e.g.,* Craig Gilbert, *Mondale Concedes,* Milwaukee Journal Sentinel, November 7, 2002, at A14 (documenting Senator Paul Wellstone's October 25, 2002 death and subsequent replacement on ballot by Walter Mondale).

It is routine in an election campaign to have so-called "October surprises," in which an unforeseen development shifts the dynamic in a political contest at the last minute. Nevertheless, to comply with section 1uck, political action committees would have to complete their campaign spending plans 31 days before an election, leaving them unable to react to subsequent public opinion polling demonstrating that a contest previously perceived as uncompetitive was suddenly within the margin of error. Or a committee might obtain additional funds it did not anticipate when it made its disclosures, only to find its hands tied by the 30–day disclosure deadline. Section 1uck does not appear to take into account any of these possibilities. As plaintiffs note, "[s]pontaneous independent speech—that is, speech not planned before the beginning of the last month before an election—will be directly suppressed." Any group wishing to run ads referring to a candidate who did not foresee the often unforeseeable would be frozen out of the final month of a campaign, a state of affairs inconsistent with the First Amendment. *See Rosen v. Port of Portland,* 641 F.2d 1243, 1249 (9th Cir.1981) ("Advance notice or registration requirements drastically burden free speech ... stifle spontaneous expression [and] ... prevent speech that is intended to deal with immediate issues."). Because section 1uck of 2001 Wis. Act 109 is not narrowly tailored to serve a significant government interest, it

violates the First Amendment. I will grant plaintiffs' motion for judgment on the pleadings as to this issue.

### C. *Non–Severability Clause*

Section 9115 (2y)(b) of 2001 Wis. Act 109 requires that *all* of the new campaign finance provisions be invalidated if a court finds *any* provision unconstitutional. The only exception is the Act's public broadcasting provisions, discussed below. By virtue of the conclusion that section 1uck of the Act is unconstitutional, the non-severability clause voids all of the Act's other campaign finance provisions. This includes those provisions that plaintiffs have challenged in this lawsuit but for which they have not sought judgment on the pleadings. It also includes sections 1ty and 1ucj, discussed earlier. Even though I concluded that on the basis of the pleadings alone, plaintiffs are not entitled to a declaratory judgment that these provisions are unconstitutional, they are voided by operation of the non-severability clause. Accordingly, the only question remaining in this litigation is whether the Act's public broadcasting provisions are preempted by federal law or are otherwise unconstitutional.

### D. *Broadcast Provision*

■ Section 1udj of 2001 Wis. Act 109 creates new Wis. Stat. § 11.21(17), which requires the Elections Board to promulgate "rules that require public access channel operators and licensees of public television stations in [Wisconsin] to provide a minimum amount of free time on public access channels and public television stations to ... candidates for state office on the ballot at general, spring, or special elections." Plaintiffs argue that the Act's public broadcasting provisions are preempted by certain provisions of the Communications Act of 1934. *See* 47 U.S.C. §§ 312(a)(7) and 315.

The Constitution and laws of the United States are "the supreme Law of the Land; ... any Thing in the Constitution or Laws of any State to the Contrary notwithstanding," U.S. Const. art. VI, cl. 2. This principle affords Congress the power to preempt state law. Plaintiffs do not maintain that Congress preempted state regulation of political broadcasting in express terms in the Communications Act of 1934. However, preemption may occur nonetheless when "Congress intends federal law to 'occupy the field' " (field preemption) or when "state law is naturally preempted to the extent of any conflict with a federal statute" (conflict preemption). *Crosby v. National Foreign Trade Council,* 530 U.S. 363, 372, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). I do not understand plaintiffs to argue that Congress has completely occupied the field of political broadcast regulation. Indeed, in the case law upon which plaintiffs rely heavily, the courts acknowledge that Congress has not preempted all state regulation of political broadcasting. *See KVUE, Inc. v. Moore,* 709 F.2d 922, 933 (5th Cir.1983) (noting that Congress did not intend "entirely to preclude state regulation of political advertising"), *aff'd mem. sub nom. Texas v. KVUE–TV, Inc.,* 465 U.S. 1092, 104 S.Ct. 1580, 80 L.Ed.2d 114 (1984). Instead, plaintiffs rely on conflict preemption, which arises "where it is impossible for a private party to comply with both state and federal law" or where " 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Crosby,* 530 U.S. at 372–73, 120 S.Ct. 2288 (citations omitted).

Section 312(a)(7) of the Communications Act of 1934 provides that the Federal Communications Commission may revoke a broadcast station's license

for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station, *other*

*than a non-commercial educational broadcasting station,* by a legally qualified candidate for Federal elective office on behalf of his candidacy.

(Emphasis added). Plaintiffs note that the highlighted language was added to the Communications Act by the Consolidated Appropriations Act of 2001, Pub.L. No. 106–554, signed into law on December 21, 2000. Although on its face § 312(a)(7) applies only to federal candidates, plaintiffs argue that the amendment's legislative history indicates a congressional intent to shield public broadcasters from any obligation to air political advertisements for state candidates as well. Plaintiffs' evidence of Congress's alleged intent consists of two statements appearing in the conference report accompanying the consolidated appropriations bill into which the amendment to the Communications Act was tucked. The first statement notes that the "Federal Communications Commission shall take no action against any non-commercial educational broadcast station which declines to carry a political advertisement." H.R. Conf. Rep. No. 106–1033, at H12280 (2000). The second states that "the conference agreement includes language to ban political advertising by public broadcasters." *Id.* at H12319. These two isolated statements, buried as they are in a mammoth appropriations bill, do not convince me that Congress intended to preempt any state effort to mandate free air time for state candidates, particularly when the plain language of § 312(a)(7) refers only to federal candidates.

The first statement directs the Federal Communications Commission to refrain from taking action against non-commercial educational broadcast stations that refuse to air political advertisements. This language is entirely consistent with § 312(a)(7), in that it instructs a federal agency to refrain from penalizing public broadcasters in accordance with a federal statute applicable on its face to federal candidates. However, it says nothing about state law or state regulators. (I note also that 2001 Wis. Act. 109 requires the promulgation of free air time rules for both public television stations *and* public access channel operators. Although it is likely that public television stations are "non-commercial educational broadcast stations" within the meaning of § 312(a)(7), it is not clear that public access channel operators fall into the same category as well.). The second statement, which refers to a "ban" on all political advertising by public broadcasters, is simply not consistent with the amended language of 47 U.S.C. § 312(a)(7). Exempting non-commercial educational broadcast stations from the threat of license revocation for refusing to allow access to federal candidates is not the same thing as a ban on all political advertisements on those stations. Accordingly, I am unpersuaded that Congress specifically immunized public broadcasters from state-imposed free air time requirements for state, as opposed to federal, candidates.

Amici maintain that even in the absence of a direct conflict between state and federal law, " 'the state may not legislate *even to complement federal enactments.*' " Amicus Curiae Br. in Supp. of Plts.' J. on the Pleadings, dkt. # 21, at 15 n. 9 (quoting *KVUE, Inc.,* 709 F.2d at 934 n. 50). This argument is not convincing for two reasons. First, the language quoted by amici is pulled from a passage in *KVUE* in which the Court of Appeals for the Fifth Circuit held that a state law imposing disclosure requirements on candidate advertisements could not be applied to federal candidates because of the preemptive effect of a federal disclosure statute. However, the court of appeals *upheld* the state law's application to state candidates, notwithstanding the existence of the federal statute. The court merely noted that the state could not supplement federal law by

imposing greater disclosure requirements on federal candidates than those mandated by the federal statute. Application of the law to state candidates was uncontroversial. Second, it is an incorrect notion that states can never enact legislation that complements a federal regulatory scheme. *See* Laurence H. Tribe, *American Constitutional Law* § 6–30, at 1195–96 (3d ed. 2000) ("Generally speaking, the Court has come to uphold state regulations that supplement federal efforts so long as compliance with the letter or effectuation of the purpose of the federal enactment is not likely to be significantly impeded by the state law."). In short, I am not convinced that Congress has preempted the states from enacting legislation requiring the provision of free air time to state candidates.

■ Plaintiffs argue also that requiring public broadcast stations to air political advertisements violates the First Amendment because such a requirement interferes with the stations' editorial discretion. The Supreme Court has recognized that the First Amendment entitles broadcasters to "exercise 'the widest journalistic freedom consistent with [their] public obligations.'" *Federal Communications Commission v. League of Women Voters of California*, 468 U.S. 364, 379, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984) (citation omitted). Restrictions on broadcasters must be "narrowly tailored to further a substantial governmental interest, such as ensuring adequate and balanced coverage of public issues." *Id.* at 380, 104 S.Ct. 3106. Plaintiffs argue that a broadcast station's free expression is embodied in its programming decisions and that the broadcast provisions of 2001 Wis. Act. 109 will seriously encroach on the ability of Wisconsin's public broadcasters to define and control their own programming. They note that the rules eventually promulgated by the Elections Board might compel public broadcasters to carry hour upon hour of political programming for hundreds of candidates involved in hundred of races. Plaintiffs raise serious First Amendment issues. However, I conclude that plaintiffs' First Amendment challenge to the broadcast provisions is not ripe for judicial review.

The ripeness doctrine prevents "courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and ... protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). The ripeness inquiry involves examining both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. The question whether states are preempted by federal law from promulgating any regulations regarding free air time for candidates did not raise ripeness issues because preemption is a question of law, *see, e.g., City of Auburn v. Qwest Corp.*, 260 F.3d 1160, 1172 (9th Cir.2001), and when a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas and Electric Co. v. State Energy Resources Conservation and Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). However, plaintiffs' First Amendment claim is on an entirely different footing because it challenges a regulation that has yet to be promulgated.

The promulgation of a regulation by itself may or may not be enough to make a pre-enforcement challenge to the regulation ripe, *see Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993), but where the regulation at issue has yet to see the light of

day it is difficult to see how a First Amendment challenge to the content of the regulation is fit for judicial review. In their briefs, plaintiffs speculate as to the over-all quantity of free air time the Elections Board's regulations might eventually force them to sacrifice. But "speculate" is the operative word here—there is no way for the court to divine the ultimate content of the regulations that the Board has been directed to promulgate. Nor is it clear how plaintiffs will suffer immediate hardship as a result of a regulation that remains on the drawing board. *See Ohio Forestry Ass'n, Inc. v. Sierra Club,* 523 U.S. 726, 734, 118 S.Ct. 1665, 140 L.Ed.2d 921 (1998) (noting lack of hardship when party has "ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain"). Further complicating plaintiffs' argument is the procedural posture of this case. Both plaintiffs and amici urge the court to take note of the fact that with limited exceptions (which are not described), all of Wisconsin's public broadcast stations feature content that is programmed centrally in Madison, which would result in the wasteful and irrational statewide broadcast of advertisements for strictly local races. However, on a motion for judgment on the pleadings the court cannot consider such a fact, which appears nowhere in the pleadings, or assume that such a problem cannot be accommodated by the Elections Board and the legislature during the rulemaking process. Accordingly, I will dismiss as unripe plaintiffs' First Amendment challenge to the requirement that the Elections Board promulgate rules requiring public broadcasters to provide a minimum amount of free air time to state candidates. Plaintiffs also raise briefly the prospect of an equal protection challenge to the regulations but I will not consider it at this time because they did not develop the argument in their briefs. In any event, it would be difficult to determine on the basis of the pleadings alone whether a regulation not yet promulgated is insufficiently tailored or otherwise inconsistent with the Fourteenth Amendment.

### ORDER

IT IS ORDERED that

1. Plaintiffs Wisconsin Realtors Association, Wisconsin Education Association Council, Wisconsin Manufacturers and Commerce, Wisconsin Grocers Association, Wisconsin Builders Association, Wisconsin Broadcasters Association (Seventh Claim for Relief), Wisconsin Farm Bureau Federation, Realtors–PAC, WEAC–PAC, WMC Issues Mobilization Council, Inc., David L. Mays, Thomas A. Bindl and Tamara Schindler's motion for judgment on the pleadings that sections 1ty and 1ucj of 2001 Wis. Act 109 violate the First Amendment on their face is DENIED;

2. Plaintiffs' motion for judgment on the pleadings that section 1uck of 2001 Wis. Act 109 violates the First Amendment on its face is GRANTED;

3. Plaintiff's motion for judgment on the pleadings that section 1udj of 2001 Wis. Act 109 is preempted by federal law is DENIED and the question whether that section violates the First Amendment is DISMISSED without prejudice as unripe for judicial review;

4. In accordance with the non-severability clause in 2001 Wis. Act 109, the treatment of all the sections of the Act identified in section 9115(2y)(b) is void and defendants are ENJOINED from enforcing those sections as they were repealed, renumbered, amended, created or recreated by the Act;

5. Because the plaintiffs' remaining claims (the second, third, fourth, fifth, sixth, and eighth claims for relief in the complaint) involve provisions of 2001 Wis.

Act 109 that have been voided by operation of the Act's non-severability clause, those claims are DISMISSED as moot; and

6. The clerk of court is directed to enter judgment and close this case.