**ARIZONA RIGHT TO LIFE POLIT-
ICAL ACTION COMMITTEE,**
Plaintiff–Appellant,

v.

Betsy BAYLESS; Janet Napolitano, in
her official capacity as the Arizona
Attorney General, Defendants–Appel-
lees.

No. 01–17065.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 2002.

Filed Feb. 25, 2003.

James Bopp, Jr. and Eric C. Bohnet, Bopp, Coleson & Bostrom, Terre Haute, IN, and Douglas V. Drury, Mueller & Drury, P.C., Scottsdale, AZ, for the appellant.

Janet Napolitano, Attorney General, Patrick Irvine, Solicitor General, and Joseph A. Kanefield, Assistant Attorney General, Phoenix, AZ, for the appellee.

Before McKEOWN and PAEZ, Circuit Judges, and POLLAK,* District Judge.

## OPINION

McKEOWN, Circuit Judge.

Negative political advertising is nothing new. Whether the mudslinging came in the form of name calling by Abraham Lincoln's detractors,[1] taunts about Grover Cleveland's draft-dodging and his illegitimate child—"Ma, Ma, where's my pa?"[2]— or the more recent and memorable Willie Horton incident—linking Governor Michael Dukakis with a furloughed convict[3] —the rough and tumble of political campaigning has embraced a wide range of political speech. Arizona's effort to curb such negative political advertising is the genesis of this lawsuit.

We consider here the extent to which a state may regulate political speech in the final days before an election. To limit negative advertising and to afford candidates an opportunity to respond to "negative hit pieces," the Arizona legislature passed a statute requiring advance notice before distribution of certain political literature and advertising. Specifically, within ten days before an election, a political action committee advocating the election or defeat of any candidate must mail a copy of the communication to the candidate at least twenty-four hours in advance. We conclude that this regulatory scheme, which imposes a severe burden on political speech, violates the First Amendment because it is not "narrowly tailored to serve a compelling state interest." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 n. 12, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999) (internal quotation marks and citations omitted). Consequently, we reverse the district court's denial of Arizona Right to Life Political Ac-

---

* The Honorable Louis H. Pollak, Senior United States District Court Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Lincoln was called everything from "Ape, Buffoon, Coward, Drunkard, Execrable," to "Knave, Lunatic, Murderer" and "Outlaw." Bruce Felknor, Dirty Politics 27 (1996).

2. *Id.* at 29; John S. Cooper, Rum, Romanism, and Rebellion: The Election of 1884, xi (2002). In the same campaign, Cleveland accused his opponent of wrongdoing: "Blaine Blaine, James G. Blaine! The Continental Liar From the State of Maine . . . ."

3. A political action committee issued an advertisement captioned, "Weekend Prison Passes," highlighting a prison furlough program supported by Dukakis. An inmate participating in that prison program had committed an attack while on a weekend pass. The George H. Bush campaign "picked up the attack in an advertisement called the 'Revolving Door,' which discussed [the] furlough program and showed a stream of men dressed in blue prison uniforms walking in and then out of a revolving door." Stephen Ansolabehere & Shanto Iyengar, Going Negative: How Political Advertisements Shrink & Polarize the Electorate 129 (1995).

tion Committee's claims for injunctive and declaratory relief.

### BACKGROUND

In 1993, the Arizona legislature passed an election reform scheme that contained, among other provisions, limitations on the timing of political advertising. Ariz.Rev. Stat. ("A.R.S.") § 16–917(A). A.R.S. § 16–917(A) provides:

> A political committee that makes independent expenditures for literature or an advertisement relating to any one candidate or office within ten days before the day of any election to which the expenditures relate, shall send by certified mail a copy of the campaign literature or advertisement to each candidate named or otherwise referred to in the literature or advertisement twenty-four hours before depositing it at the post office for mailing, twenty-four hours before submitting it to a telecommunications system for broadcast or twenty-four hours before submitting it to a newspaper for printing.

Section 16–917(A) applies only to "independent expenditures," which are defined as:

> [A]n expenditure by a person or political committee, other than a candidate's campaign committee, that expressly advocates the election or defeat of a clearly identified candidate, that is made without cooperation or consultation with any candidate or committee or agent of the candidate and that is not made in concert with or at the request or suggestion of a candidate, or any committee or agent of the candidate.

A.R.S. § 16–901(14). A political action committee ("PAC") that violates § 16–917(A) must pay "a civil penalty of three times the cost of the literature or adver-

tisement that was distributed in violation of this section." *Id.* at § 16–917(D).

Appellant Arizona Right to Life Political Action Committee ("ARLPAC") is a PAC. According to its bylaws, ARLPAC's primary purpose is to "present detailed and factual information upon which individuals and the general public may make an informed decision about the various topics of fetal development, abortion, alternatives to abortion, euthanasia, and infanticide." ARLPAC seeks to advance this goal by "[i]dentifying and educating the public regarding candidates for public office . . . ." To further this objective, ARLPAC often makes independent expenditures to express its support for or opposition to candidates.

Believing that § 16–917(A) impermissibly burdens its right to speak and educate the public about certain candidates, ARLPAC filed an action challenging the constitutionality of this statute. ARLPAC's motion for preliminary injunction was consolidated with a trial on the merits. The district court denied ARLPAC's request for a permanent injunction and a declaratory judgment with respect to § 16–917(A).[4]

### DISCUSSION

#### I. ARLPAC HAS STANDING TO CHALLENGE A.R.S. § 16–917(A)

■ As a threshold matter, we must consider whether ARLPAC has standing to challenge A.R.S. § 16–917(A). The "case and controversy" mandate of Article III of the Constitution requires us to address standing even though Arizona did not argue the point in its briefs and first raised the issue at oral argument.

---

**4.** The suit also included claims related to other provisions of Arizona's election reform law

that are not the subject of this appeal.

Under Article III, a federal court only has jurisdiction to hear claims that present an actual "case or controversy." *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). To satisfy this prerequisite, a plaintiff must demonstrate that it has suffered an "injury-in-fact," i.e., "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."[5] *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979). This direct injury requirement is tempered, however, in that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." *Reg'l Rail Reorg. Act Cases*, 419 U.S. 102, 143, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) (internal quotation marks and citations omitted). Rather, it is "sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir.2000) (quoting *Babbitt*, 442 U.S. at 298, 99 S.Ct. 2301).

■ Constitutional challenges based on the First Amendment present unique standing considerations. In an effort to avoid the chilling effect of sweeping restrictions, the Supreme Court has endorsed what might be called a "hold your tongue and challenge now" approach rather than requiring litigants to speak first and take their chances with the consequences. *See Dombrowski v. Pfister*, 380 U.S. 479, 486, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965) (recognizing the "sensitive nature of constitutionally protected expression," in permitting a pre-enforcement action involving the First Amendment); *see also*

*Bland v. Fessler*, 88 F.3d 729, 736–37 (9th Cir.1996) ("That one should not have to risk prosecution to challenge a statute is especially true in First Amendment cases . . . ."). Were it otherwise, "free expression—of transcendent value to all society, and not merely to those exercising their rights—might be the loser." *Dombrowski*, 380 U.S. at 486, 85 S.Ct. 1116. Thus, "when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO*, 205 F.3d at 1155.

■ The record before us demonstrates that ARLPAC has suffered injury from the operation of § 16–917(A). Although ARLPAC has neither violated the statute nor been subject to penalties for doing so, ARLPAC was forced to modify its speech and behavior to comply with the statute. For example, ARLPAC wanted to disseminate advertising without providing twenty-four hour advance notice to candidates; nonetheless, to avoid penalties associated with failure to satisfy the notification requirement, ARLPAC provided the notice and delayed its speech both before the September 2000 primary election and subsequent elections. Thus, as in *Virginia v. Am. Booksellers Ass'n*, ARLPAC faced actual harm from the operation of the statute because "the alleged danger of [§ 16–917(A)] is, in large measure, one of self-censorship; a harm that can be realized even without an actual prosecution." 484 U.S. 383, 393, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988).

It was not unreasonable for ARLPAC to modify its behavior out of fear of being the object of an enforcement action. Arizona has not suggested that the legislation will not be enforced if ARLPAC or any other PAC were to violate its provisions nor has

---

**5.** A plaintiff also must demonstrate that the injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751, 104 S.Ct. 3315. These two requirements are unquestionably satisfied here.

§ 16–917(A) fallen into desuetude. *Bland,* 88 F.3d at 737. Under such circumstances, ARLPAC faced a reasonable risk that it would be subject to civil penalties for violation of the statute. *See Am. Booksellers Ass'n,* 484 U.S. at 393, 108 S.Ct. 636(concluding that plaintiffs have standing where the "State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise"); *Babbitt,* 442 U.S. at 302, 99 S.Ct. 2301(noting the government's failure to state that it would not prosecute parties like plaintiffs and concluding that plaintiffs "are thus not without some reason in fearing prosecution"). Because ARLPAC reasonably feared prosecution under § 16–917 for engaging in protected speech, ARLPAC has standing to challenge the statute. *See Majors v. Abell,* 317 F.3d 719 (7th Cir.2003) (holding in political advertising case that if a statute "may deter constitutionally protected expression because most people are frightened of violating criminal statutes . . ., there is standing.").

Finally, we observe that it would turn respect for the law on its head for us to conclude that ARLPAC lacks standing to challenge the provision merely because ARLPAC chose to comply with the statute and challenge its constitutionality, rather than to violate the law and await an enforcement action. Rather, ARLPAC's decision to comply "demonstrates a commendable respect for the rule of law," *see Bland,* 88 F.3d at 737, and should not preclude ARLPAC from challenging the statute. *See Mobil Oil Corp. v. Attorney Gen. of Va.,* 940 F.2d 73, 75 (4th Cir.1991) ("Public policy should encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the

while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.").

 Accordingly, we conclude that ARLPAC has standing to challenge A.R.S. § 16–917(A).[6] Because we are satisfied that we have jurisdiction, we now turn to the merits of this appeal.

## II. FIRST AMENDMENT

The central question raised in this appeal is whether the notice requirement contained in A.R.S. § 16–917(A) imposes an impermissible burden on political speech in violation of the First Amendment. We consider this issue *de novo,* "requir[ing] us to apply principles of First Amendment jurisprudence to the specific facts of this case." *Gerritsen v. City of Los Angeles,* 994 F.2d 570, 575 (9th Cir. 1993) (quoting *ACORN v. Phoenix,* 798 F.2d 1260, 1263 (9th Cir.1986) (internal quotations marks omitted)).

 The Supreme Court teaches that "[w]hen deciding whether a state election law violates [First Amendment rights], we weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997) (internal quotation marks and citations omitted). "Regulations imposing severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually

---

**6.** To the extent Arizona also suggests that the challenge is not ripe for review, our conclusion that ARLPAC has suffered actual harm dispenses with any ripeness concerns. *LSO,* 205 F.3d at 1156.

be enough to justify reasonable, nondiscriminatory restrictions." *Id.* (internal quotation marks and citations omitted). *Accord Buckley,* 525 U.S. at 192 n. 12, 119 S.Ct. 636 (describing the "now-settled approach" that state regulations "impos[ing] 'severe burdens' on speech ... [must] be narrowly tailored to serve a compelling state interest." (internal quotation marks and citations omitted) (modifications in original)). We agree with the district court that § 16–917(A) is subject to strict scrutiny because it imposes a severe burden on speech. The statute imposes a prior restraint on PACs through a twenty-four hour notification requirement. Several important features of this statute require us to invoke strict scrutiny.

■ Significantly, the statute is aimed at political speech, which is at the heart of our democratic process and "operates at the core of the First Amendment." *Boos v. Barry,* 485 U.S. 312, 318, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988); *see also Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs."). The First Amendment reflects a " 'profound national commitment' to the principle that 'debate on public issues should be uninhibited, robust, and wide-open.' " *Boos,* 485 U.S. at 318, 108 S.Ct. 1157 (quoting *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). Rather than allowing free-flowing, uninhibited speech in the last days before the election, however, § 16–917(A) imposes a twenty-four hour waiting period before distribution of communications to the public. This "built-in delay mechanism" prevents the timely exercise of First Amendment rights and prohibits spontaneous political expression. *Grossman v. City of Portland,* 33 F.3d

1200, 1206 (9th Cir.1994) (quoting *Cmty. for Creative Non–Violence v. Turner,* 714 F.Supp. 29, 33 (D.D.C.1989)). Restricting spontaneous political expression places a severe burden on political speech because, as the Supreme Court has observed, "timing is of the essence in politics ... and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 163, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (Harlan, J., concurring); *Rosen v. Port of Portland,* 641 F.2d 1243, 1247–50 (9th Cir.1981) (holding one-day advance notice requirement for demonstrating or distributing leaflets in airport imposes a severe burden on speech and constitutes a prior restraint). To suggest that the waiting period is minimal ignores the reality of breakneck political campaigning and the importance of getting the message out in a timely, or, in some cases, even instantaneous fashion.

Section 16–917(A) does more than delay communication. It also effectively prohibits speech in situations where the communication was not, or could not have been, prepared far enough in advance of the election for the PAC to comply with the notice provision. To illustrate this point, consider the effect of § 16–917(A) on the following situation: Assume that a candidate erroneously implied in a news conference on the Sunday before election day (Tuesday) that he had a PAC's endorsement. Although the PAC may wish to place a newspaper advertisement or run a television spot to inform the public of this error, the PAC would be prohibited from doing so under § 16–917(A) because it would be impossible for the PAC to comply with the twenty-four hour notice requirement and still distribute its communication to the public before the Tuesday election.

Consider a variation on the theme. In this digital age, political communications are increasingly being mass distributed via the Internet.[7] Imagine that in an eleventh hour letter distributed via the Internet, a candidate disparaged his opponent's PAC endorsement and receipt of considerable PAC funds. The PAC would be hogtied in its ability to respond. Although an Internet response easily could be generated from a technical standpoint, the advance notice rule would preclude a response before election day. Thus, the delay mandated by the notice requirement places a severe burden on speech because it "may even preclude expression necessary to provide an immediate response to late-breaking events." *Grossman*, 33 F.3d at 1206 (quoting *Cmty. for Creative Non–Violence*, 714 F.Supp. at 33(internal quotation marks omitted)).

 Section 16–917(A) also is subject to strict scrutiny as a content-based regulation—it applies only to independent expenditures which "expressly advocate[ ] the election or defeat of a clearly identified candidate." For example, § 16–917(A) allows a PAC to place without restriction a newspaper advertisement that highlights a candidate's voting record on key issues, states that a candidate believes in gun control or describes a candidate as "environment friendly," but requires a twenty-four hour delay if the advertisement implores the public to vote for that candidate. Thus, whether an advertisement is subject to the requirements of § 16–917(A) depends entirely on the content of the communication. *See Burson v. Freeman*, 504 U.S. 191, 197, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (holding statute prohibiting political speech within 100 feet of polling place on election day is content-based because it only regulates speech relating to political campaigns and cannot be applied without reference to content of the communication). Although the statute does not discriminate on the basis of the viewpoints expressed in the advertisements, we still apply strict scrutiny because the "First Amendment's hostility to content-based regulation" applies even where the regulation "does not favor either side of a political controversy." *Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 537, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980).

 The statute poses yet another difficulty in its imposition of restrictions on PACs that are not levied on candidates and other participants in the political process. Under § 16–917(A), an individual or a candidate could immediately run an advertisement stating "Defeat Burns—He Sold Weapons to Terrorists" whereas a PAC would have to wait twenty-four hours before running the same advertisement. Such "discrimination is permissible in the context of the First Amendment only if the discrimination itself is necessary to serve a substantial governmental interest." *Serv. Employees Int'l Union v. Fair Political Practices Comm'n*, 955 F.2d 1312,

7. For example, Senator Joseph Lieberman recently sent numerous unsolicited e-mails to potential voters announcing his plans to seek the Democratic nomination for the presidency. Similar efforts have been used by candidates from both parties, including Florida Governor Jeb Bush and Bill Jones, an unsuccessful gubernatorial candidate in California. *See* Declan McCullagh, *Perspective: Hail to the ... Spammer–in–Chief?*, (Jan. 20, 2003), *available at* http://news.com.com/2010–1071–981258.html (Jan. 31, 2003). Websites also have been used as campaign tools. In Arizona, Matt Salmon, a candidate in the 2002 Arizona gubernatorial race, created a website that allowed supporters to send "virtual campaign post cards" to their friends and to download Salmon screen savers and wallpaper for their computers. *See* http://www.salmonforgovernor.com/interactive/index.asp (last visited Jan. 31, 2003). *See also generally* RICHARD DAVIS, THE WEB OF POLITICS. THE INTERNET'S IMPACT ON THE AMERICAN POLITICAL SYSTEM, 85–120 (1999).

1320(9th Cir.1992) (citing *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990)). Therefore, "when a statute regulating political campaigns discriminates against a class of participants in the political process, the discrimination must be independently justified, even where the statute is viewpoint and content neutral." *Id.*

These reasons lead us to conclude that the advance notice requirement of § 16–917(A) severely burdens speech by restricting spontaneous expression, by regulating speech on the basis of content, and by discriminating against PACs. Laws that severely burden speech are "presumptively unconstitutional and the state bears the burden of justification." *Rosen,* 641 F.2d at 1246. We apply strict scrutiny analysis and may uphold the constitutionality of the challenged statute only if the state demonstrates that the statute is narrowly tailored to serve a compelling state interest. *Timmons,* 520 U.S. at 358, 117 S.Ct. 1364.

■■■ Arizona argues that the advance notice requirement is substantially related to the state's compelling interest in promoting an informed electorate and in avoiding corruption or the appearance of corruption in the political process.[8] It is difficult to relate these stated purposes to the legislation at issue. Not surprisingly, legislative history is scant. The sparse legislative history that exists is best characterized as a pre-legislative study effort. The Election Reform Study Committee, established by the legislature in 1991, issued a final report that contained a recom-

mendation concerning independent campaign expenditures. Election Reform Study Committee Final Report (1991) ("Study Report"). The Study Report recommended that a copy of the advertising or literature be submitted to the Secretary of State within "24 hours of the time it airs or is distributed if the advertisement or literature airs or is distributed in the 20 days preceding the election." The other recommendations related to reporting of expenditures. *Id.* at 15. Nothing in the report suggested a pre-distribution notification requirement or advance disclosure to the candidate.

According to Arizona, the notice requirement is necessary to an informed electorate because it affords candidates an opportunity to respond to last-minute negative "hit pieces" that may confuse or misinform voters. In evaluating this assertion, we are guided by the Supreme Court's discussion in *Mills v. State of Alabama.* In *Mills,* the state passed a law making it a crime to "do any electioneering or to solicit any votes ... on the day on which the election affecting such candidates or propositions is being held." *Mills,* 384 U.S. at 216, 86 S.Ct. 1434 (internal quotation marks omitted). The state asserted that this ban was justified by the same interest asserted here, namely, the state's interest in protecting the public from "last minute charges and countercharges and the distribution of propaganda in an effort to influence voters ... when as a practical matter, because of lack of time, such matters cannot be answered or their truth determined

---

**8.** In an effort to demonstrate legislative purpose, Arizona offered, and the district court relied upon, various newspaper articles expressing dismay over the level of negative campaigning in recent elections. These articles, however, failed to demonstrate that the restrictions on PACs are supported by compelling governmental interests, particularly because many of the articles do not discuss advertisements placed by PACs at all, but

rather focus on the candidates' own negative campaigning. Further, even if these articles did demonstrate the public's concern over campaign practices, these articles are inadequate to demonstrate the legislature's purpose in enacting the statute. Although the views of then Speaker of the House Jane Dee Hull are expressed in an editorial, her editorial sheds little light on the motives of the legislature as a whole.

until after the election is over." *Id.* at 219–220, 86 S.Ct. 1434 (internal quotation marks and citations omitted). The Supreme Court explained the defect in this rationale:

> This argument, even if it were relevant to the constitutionality of the law, has a fatal flaw. The state statute leaves people free to hurl their campaign charges up to the last minute of the day before election. The law ... then goes on to make it a crime to answer those "last minute" charges on election day, the only time they can be effectively answered. Because the law prevents any adequate reply to these charges, it is wholly ineffective in protecting the electorate "from confusive last-minute charges and countercharges."

*Id.* at 220, 86 S.Ct. 1434.

As in *Mills*, the notice requirement does not bear a substantial relationship to the state's interest in protecting voters from confusion and misinformation. The law leaves candidates and individuals "free to hurl their campaign charges" without the burden of a twenty-four hour waiting period but prevents PACs from responding to these charges in a timely manner. In the absence of any evidence to suggest that PACs are more likely to distort facts or confuse voters than are the candidates themselves or that PAC speech warrants special treatment,[9] the state has not met its burden of demonstrating that § 16–917(A) will "maximize voter education" or prevent confusion. Indeed, the notice requirement may have the opposite effect by preventing PACs from responding to last minute campaigning, including misinformation circulated by candidates. Although

this scheme may succeed in ensuring that candidates have the last word, no evidence suggests that § 16–917(A) serves the state's interest in maximizing voter education.

Even assuming that § 16–917(A) bears a substantial relationship to the state's interest in maximizing voter education, the statute still fails to satisfy strict scrutiny because it is not narrowly tailored to serve this interest. Restrictions that severely burden First Amendment rights "must be the least drastic means of protecting the governmental interest involved; its restrictions may be 'no greater than necessary or essential to the protection of the governmental interest.'" *Rosen*, 641 F.2d at 1246(quoting *Baldwin v. Redwood City*, 540 F.2d 1360, 1367 (9th Cir.1976)). "In determining whether a [statute] is narrowly tailored to serve a significant government interest, we look to the 'fit' between the state's regulation and the stated purposes ...." *Gerritsen*, 994 F.2d at 577.

Here, the fit between § 16–917(A) and the statute's purpose is poor at best. First, the statute fails to meet its objective of providing candidates notice. By not requiring actual notice but instead requiring only that the communication be sent to the candidate via certified mail, a PAC intent on keeping a candidate in the dark could simply mail the communication to the candidate on Saturday morning, submit the communication to the media on Sunday (twenty-four hours later), and begin radio or television spots containing the communication on either Sunday or Monday. Because mail is not delivered on Sundays, the communication would not reach the candidate before the communica-

---

9. Although the state did not offer any credible evidence on this point, it is interesting to note that in a published study of Federal Election Commission records of independent expenditures, two respected academics concluded that "independent money isn't bad for elec-

tions, since it goes overwhelmingly to produce positive messages" and "interest groups promote candidates much more frequently than they attack." GOING NEGATIVE, *supra* note 3, at 129.

tion became public and the notice requirement would fail to ensure that the candidate actually was provided with advance notice. As a practical matter, any notice mailed locally in Arizona on Saturday morning would, at best, not reach the candidate until Monday, and perhaps later. Even more Machiavellian would be to mail the notice from the East Coast, ensuring that the PAC's local political mailing would reach voters long before it reached the candidate. Indeed, the PAC itself may even be based on the East Coast and thus might legitimately issue notice from its local post office several thousand miles away from the Arizona election arena.

As ARLPAC points out, Arizona could eliminate this problem, while also reducing the statute's restraint on spontaneous speech, by "allowing the communication to be submitted or mailed at the same time that a copy is provided to the candidate by immediate delivery methods such as facsimile, e-mail, telephone, or hand delivery." By restricting PACs from providing notice via the most expeditious means available, § 16–917(A) places a greater burden on speech than is necessary to simply provide notice to candidates.

In addition, for a significant segment of the population, Arizona's early voting procedures are making "last-minute" campaigning an outdated notion. Since Arizona began allowing its citizens to vote early either by mail or in person at various satellite polling places, see A.R.S. § 16–542(D), an increasing number of voters have begun voting in advance of election day. For instance, in the 2000 presidential election, approximately thirty-five percent of Arizona voters cast their ballots in advance.[10] During the summer primaries in 2002, the percentage of early-voters rose to over fifty percent in some Arizona counties.[11] As Arizona voters can cast their ballots a full month before election day, the notice requirement, which only applies during the ten days prior to the election, may have a diminished impact on a significant percentage of the voters.[12]

Significantly, although Arizona claims that the purpose behind § 16–917(A) is to provide candidates with an opportunity to respond to negative political advertisements placed by PACs, the statute is over-inclusive because it is not limited to negative campaigning but rather reaches all of a PAC's independent expenditures that advocate for or against the election of any candidate. Because the notice requirement applies even if the expenditure merely paid for vanilla advertisements advocating "Vote for Smith," or "Freedom Lovers for Jones—Re-elect Our Senator," § 16–917(A) burdens innocuous speech that does not even implicate the statute's stated purpose. See Grossman, 33 F.3d at 1207–08 ("Because [the statute] 'restricted a substantial quantity of speech that [did] not impede the City's permissible goals,' it is unconstitutional." (citations omitted) (second alteration in original)).

On the flip side, the statute is also under-inclusive in that it fails to reach many kinds of negative campaigning that would

10. See Dotty Lynch, Vote Early, Vote Often, CBS News, Oct. 7, 2002, available at http://www.cbsnews.com/stories /2002/10/07/opinion/lynch/main524605.shtml (last visited Jan. 31, 2003); Marc Ambinder, Early and In–Person Absentee Ballot: Voting in Many States Has Begun, ABC News, available at http://abcnews.go.com/sections/politics/DailyNews/earlyvoting.html (last visited Jan. 31, 2003); Brooke Donald (Associated Press), Voting Early: More People Getting the Jump on Election Day, Dodge City Daily Globe, Sept. 28, 2002.

11. See Voting Early, supra note 10.

12. See, e.g., Pima County Elections Voter Information, available ' at http://www.co.pima.az.us/elections/vote.htm (last visited Jan. 31, 2003).

relate to the purported legislative purpose. Because § 16–917(A) only applies to communications that "expressly advocate[ ] the election or defeat of a clearly identified candidate," a clearly innocuous communication—such as "Vote for Smith"—would be subject to the notice requirement whereas a communication that falsely accused Smith of disgraceful behavior—such as "Smith is a Convicted Liar"—or attacked his views, such as "Smith—Soft on Crime"—could be sent immediately as long as it did not expressly advocate for the candidate's defeat. In contrast to PACs, candidates and individuals are free to place as many negative, misleading or confusing advertisements as they like, none of which are subject to the advance notice requirement. By differentiating between PACs and individuals or candidates, the notice requirement fails to "fit" its purpose of limiting negative campaigning and unnecessarily restrains the right of association protected by the First Amendment. *See Citizens Against Rent Control/Coalition for Fair Hous. v. City of Berkeley,* 454 U.S. 290, 296, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981).

Nor is § 16–917(A) substantially related to Arizona's interest in preventing corruption or the appearance of corruption in the political process. Although we do not doubt that the state has an interest in preventing corruption and the appearance of corruption in its elections, Arizona has failed to explain how the statute relates to these interests.[13] We are not persuaded

by Arizona's attempt to equate the notice statute with the financial disclosure requirements upheld in *Buckley* and *FEC v. Furgatch,* 807 F.2d 857 (9th Cir.1987). Unlike statutes that require the disclosure of financial information, § 16–917(A) does not seek to "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *See Buckley,* 424 U.S. at 67, 96 S.Ct. 612. Nor does it seek to "minimize the influence that unaccountable interest groups and individuals can have on elected federal officials." *Furgatch,* 807 F.2d at 862. In fact, § 16–917(A) does not regulate any financial aspects of a PAC's participation in the political process. Rather, it imposes a more pernicious burden on speech in that it delays, and sometimes even prevents, political speech on the basis of content. Because Arizona has failed to offer any evidence of a connection between PACs' unrestricted ability to place political advertisements in the waning days of a campaign and corruption or the appearance of corruption in the electoral process, § 16–917(A) cannot pass muster on this basis.

■■■ Finally, we cannot agree that the statute is justified by the state's desire, as explained in its brief, to "deter last minute negative campaigning by those whom the candidates cannot control." This premise is flawed—the statute is not directed to negative advertising nor does the state's evidence support even an infer-

---

**13.** As one district court noted recently in striking down a similar advance notice law, "[i]t is not enough simply to invoke the general desire to avoid corruption or its appearance without explaining how[the statute] furthers that goal." *Wisconsin Realtors Ass'n v. Ponto,* 233 F.Supp.2d 1078, 1091 (W.D.Wis. 2002). In *Wisconsin Realtors,* the court held that an election reform statute violated the First Amendment where the statute prohibited any independent group from making a com-

munication relating to a candidate within thirty days before an election unless the group had filed a report with the Elections Board, the candidates in the race, and their political parties no later than thirty-one days before the election "detailing 'the name of each candidate who *will* be supported or whose opponent *will* be opposed and the total disbursements *to be* made.' " *Id.* at 1090 (emphasis in original).

ence that the PACs are a significant source of negative press. We acknowledge that there is not always a unity of interests between PACs and candidates in terms of control,[14] but this disconnect does not justify restricting the speech of the one while promoting the speech of the other. Admittedly, negative campaigning may be distasteful to some politicians and voters; it is nonetheless fundamental in First Amendment jurisprudence that "it is not the function of government to promote speech it deems more valuable and to suppress speech it deems less valuable." *Lind v. Grimmer*, 30 F.3d 1115, 1119 (9th Cir.1994). This proposition holds true even where, as here, the state uses the regulations in question to promote speech from candidates or other individuals. As the Supreme Court explained:

> [T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment, which was designed "to secure the widest possible dissemination of information from diverse and antagonistic sources," and "to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people."

*Buckley*, 424 U.S. at 48–49, 96 S.Ct. 612(quoting *Sullivan*, 376 U.S. at 266, 269, 84 S.Ct. 710 (internal quotation marks omitted)). On this record, the state has not established a legitimate interest in suppressing negative political speech from PACs, even in the interest of promoting speech from candidates. To the contrary, the First Amendment requires that politicians "tolerate insulting, and even outrageous, speech in order to provide 'adequate breathing space to the freedoms

protected by the First Amendment.' " *Boos*, 485 U.S. at 322, 108 S.Ct. 1157(quoting *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988)); *accord McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 356, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) ("[Although] political speech by its nature will sometimes have unpalatable consequences, [ ] our society accords greater weight to the value of free speech than to the dangers of its misuse.").

### CONCLUSION

Although Arizona's efforts may be well-intentioned and adopted in the spirit of good government, the statute puts the state at the crossroads of political speech and in the role of a First Amendment traffic cop—a prospect that raises red flags, if not red lights. Because A.R.S. § 16–917(A) places a severe burden on speech and is not narrowly tailored to advance compelling governmental interests, the statute is an unconstitutional regulation of speech.

**REVERSED.**

---

14. As Ansolabehere and Iyengar observe: "Organized interests seem to have a unique edge in going negative. Attack advertisements from interest groups convey all of the negatives about the candidate who is attacked without the risk of a political backlash against the candidate the group supports." *See* GOING NEGATIVE, *supra* note 3, at 128.