# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-2172

_____

Missourians for Fiscal Accountability

*Plaintiff - Appellant*

v.

James Klahr, in his official capacity as Executive Director of the Missouri Ethics Commission

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Jefferson City

_____

Submitted: February 11, 2016
Filed: July 29, 2016

_____

Before LOKEN, ARNOLD, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Missourians for Fiscal Accountability (MFA) formed a campaign committee on October 22, 2014—less than 30 days before the November 4 election—in violation of Missouri law section 130.011(8).[1]  MFA sued the executive director of

_____

[1]All statutory citations are to RSMo Supp. 2013, unless otherwise indicated.

the Missouri Ethics Commission (MEC), in his official capacity, seeking to declare unconstitutional the 30-day formation deadline. The district court granted a temporary restraining order, but after the election, dismissed MFA's suit as not ripe. MFA appeals. Having jurisdiction under 28 U.S.C. § 1291, this court reverses and remands.

I.

Campaign committees are "formed by an individual or group of individuals to receive contributions or make expenditures and whose sole purpose is to support or oppose the qualification and passage of one or more particular ballot measures in an election . . . ." **§ 130.011(8)**. These committees "shall be formed no later than thirty days prior to the election" and "shall terminate the later of either thirty days after the general election or upon the satisfaction of all committee debt after the general election . . . ." ***Id.***

"Any person who knowingly accepts or makes a contribution or makes an expenditure in violation of any provision of this chapter [130] . . . shall be held liable to the state in civil penalties in an amount equal to any such contribution or expenditure." **§ 130.072**. "Upon vote of at least four members, the commission may initiate formal judicial proceedings seeking to obtain any of the following orders: . . . (2) Pay any civil penalties required by . . . chapter 130." **§ 105.961.5(2)**. The MEC has through "reconciliation agreements or civil action, the power to seek fees for violations in an amount not greater than one thousand dollars or double the amount involved in the violation." **§ 105.961.4(6)**. In its verified answer, the MEC says that it negotiates payment of a fee with the treasurer of a campaign committee that forms within 30 days of the election. Consent orders show that the MEC negotiates payment of part of the fee (about 10 percent). The remainder of the fee is then stayed

until "any further violation of the campaign finance laws under Chapter 130, RSMo, within the two-year period from the date of this order . . . ."[2]

Thirteen days before the November 2014 general election, a group of individuals formed MFA as a campaign committee. **§ 130.011(8)**. That same day, MFA notified the IRS that it was a political organization under section 527, claiming it was "created to ensure that the finances of the State of Missouri are properly represented and explained to the voting citizens of the State during the legislative process."[3] The next day, MFA filed its Articles of Incorporation of a nonprofit corporation in Missouri, stating its purpose was the "education of general public on issues concerning fiscal responsibility." MFA listed its duration as "perpetual," and it remains in good standing with the State. *See* **Missouri Online Business Filing: Search for a Business Entity**, *available at* https://bsd.sos.mo.gov/BusinessEntity/BESearch.aspx?SearchType=0 (last visited July 26, 2016); **IRS: Search Political Organization Disclosures**, *available at* https://forms.irs.gov/app/pod/basicSearch/search?execution=e1s1 (last visited July

---

[2]Additionally, "[a]ny person who purposely violates the provisions of [chapter 130] is guilty of a class A misdemeanor." **§ 130.081.1 RSMo 2000**. *See Impey v. Missouri Ethics Comm'n*, 442 S.W.3d 42, 44 (Mo. banc 2014) (recognizing "if the MEC believes that there are reasonable grounds that a violation of a criminal law has occurred, the MEC may refer the report to the appropriate prosecutor upon a vote of four members of the commission."); **§ 105.961.2** ("When the commission concludes . . . that a violation of any criminal law has occurred, and if the commission believes that criminal prosecution would be appropriate upon a vote of four members of the commission, the commission shall refer the report to the Missouri office of prosecution services . . . for appointment of an attorney to serve as special prosecutor . . . ."). "Any person who fails to file any report or statement required by this chapter [130] within the time periods specified in sections 130.011 to 130.051 is guilty of an infraction." **§ 130.081.2 RSMo 2000**.

[3]On March 27, 2015—months after the election—MFA amended its 527 purpose to "Support Constitutional amendment 10."

26, 2016). *See generally **Pickett v. Sheridan Health Care Ctr.***, 664 F.3d 632, 648 (7th Cir. 2011) (recognizing "the authority of a court to take judicial notice of government websites").

According to MFA, section 130.011(8) prohibited it from receiving contributions or making expenditures because it formed less than 30 days before the 2014 general election. MFA thus initially refrained from receiving contributions and making expenditures. Eight days after formation, MFA sought declaratory and injunctive relief from the 30-day formation deadline. MFA asserted that the formation deadline unconstitutionally burdened its First Amendment rights to free speech and political association. Two days before the election—on November 2—the district court issued a temporary restraining order. *See **Missourians for Fiscal Accountability v. Klahr***, 2014 WL 5530996 (W.D. Mo. Nov. 2, 2014). MFA then received contributions and spent $525 on robocalls.

After the election, MFA filed the required termination statement. *See* **§ 130.021.8**. Though the district court found MFA's claims not moot, it dismissed MFA's claims on ripeness grounds, without prejudice. *See **Missourians for Fiscal Accountability v. Klahr***, 2015 WL 1893359 (W.D. Mo. Apr. 27, 2015). MFA appeals.

II.

The MEC asserts MFA lacks standing because it faces no actual or imminent threat of a concrete and particularized injury-in-fact.

"Standing is always a 'threshold question' in determining whether a federal court may hear a case." ***281 Care Comm. v. Arneson***, 638 F.3d 621, 627 (8th Cir. 2011). A party invoking federal jurisdiction has the burden of establishing standing "for each type of relief sought." ***Summers v. Earth Island Inst.***, 555 U.S. 488, 493

(2009). "[A]n actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Preiser v. Newkirk*, 422 U.S. 395, 401 (1975). *See also Salazar v. Buono*, 559 U.S. 700, 731 (2010) (Scalia, J., concurring) ("A plaintiff cannot sidestep Article III's requirements by combining a request for injunctive relief for which he *has* standing with a request for injunctive relief for which he *lacks* standing.").

> [T]o seek injunctive relief, a plaintiff must show that he is under threat of suffering 'injury in fact' that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable to the challenged action of the defendant; and it must be likely that a favorable judicial decision will prevent or redress the injury.

*Summers*, 555 U.S. at 493, *quoted in Bernbeck v. Gale*, 2016 WL 3769481, at \*2 (8th Cir. July 14, 2016). To seek declaratory relief, standing must exist "at the time of the hearing. . . ." *Golden v. Zwickler*, 394 U.S. 103, 108 (1969).

In the First Amendment context, "two types of injuries may confer Article III standing to seek prospective relief." *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003), *citing Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003). First, MFA could establish standing by alleging "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979). Second, MFA can establish standing by alleging that it self-censored. *281 Care Comm.*, 638 F.3d at 627. "[A] First Amendment plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the statute's *chilling effect* on his desire to exercise his First Amendment rights." *Ward*, 321 F.3d at 1267 (internal quotations omitted) (emphasis in original)). Indeed, "when there is a danger of chilling free speech, the concern that constitutional

adjudication be avoided whenever possible may be outweighed by society's interest in having the statute challenged." ***Secretary of State of Md. v. Joseph H. Munson Co.***, 467 U.S. 947, 956 (1984) (applying this principle to the prudential concern with third-party standing), *cited by* ***Cooksey v. Futrell***, 721 F.3d 226, 235 (4th Cir. 2013) ("The leniency of First Amendment standing manifests itself most commonly in the doctrine's first element:  injury-in-fact."). *See also* ***Arizona Right to Life Political Action Committee v. Bayless***, 320 F.3d 1002, 1006 (9th Cir. 2003) ("[W]hen the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing.").

In its verified complaint, MFA says it engaged in self-censorship to comply with section 130.011(8).  For 11 days—from formation until the entry of the temporary restraining order—MFA did not receive contributions or make expenditures.  MFA's treasurer swears he "prohibited any agent of the organization from soliciting and/or accepting contributions or pledges from any corporate entity based on the prohibitions found in Section 130.011 . . . of the Missouri Revised Statutes."  And, the verified complaint adds that "[b]ut for the thirty-day blackout period . . . and the substantial likelihood of being subjected to a criminal prosecution," MFA would have "immediately [sought] to raise and expend funds in support of Proposition 10."

In analyzing a claim of standing through self-censorship, "[t]he relevant inquiry is whether a party's decision to chill his speech in light of the challenged statute was 'objectively reasonable.'" ***281 Care Comm.***, 638 F.3d at 627.  Even when complaints against plaintiffs do not reach "the criminal stage and no criminal prosecution was ever threatened, non-criminal consequences contemplated by a challenged statute can also contribute to the objective reasonableness of alleged chill." ***Id.*** at 630.  By Missouri law, "[a]ny person who knowingly accepts or makes a contribution or makes an expenditure in violation of any provision of this chapter [130] . . . *shall be held liable to the state in civil penalties* in an amount equal to any such contribution or

expenditure." **§ 130.072** (emphasis added). And, MEC's verified answer confirms its policy to impose a fee. In light of the statute's plain language and the MEC's stated policy, MFA's self-censorship is objectively reasonable. *Cf. National Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 690 (8th Cir. 2003) ("There is no dispute over [the committee's] standing to challenge section 130.011(10); [the committee] clearly falls within the statute's definition of a 'continuing committee.'").

MFA has Article III standing to challenge section 130.011(8) on First Amendment grounds.

III.

Though the 2014 election has passed, this case is not moot. For mootness, the "requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000). MFA violated the formation deadline by forming within thirty days of election. For this, the MEC can impose a fee. *See* **§ 105.961.4(6)**. That it has not yet done so is irrelevant because the MEC's inaction "is not permanent." *See Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983) (holding that a moratorium on the use of choke holds by the police department did not moot a case challenging the constitutionality of the use of choke holds because "[i]ntervening events have not irrevocably eradicated the effects of the alleged violation") (internal quotations omitted)). *Cf. Knox v. Service Employees*, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit resumption of the challenged conduct as soon as the case is dismissed."). MEC can at any time implement its policy and assess the fee for violation of the formation deadline in section 130.011(8). The MEC and MFA continue to have "adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Golden*, 394 U.S. at 108.

Alternatively, MFA invokes the exception to mootness for "capable of repetition yet evading review." This exception will "rescue an otherwise moot claim if (1) the challenged conduct is of too short a duration to be litigated fully prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Connor*, 323 F.3d at 691. The question is "whether the controversy was *capable* of repetition and not . . . whether the claimant had demonstrated that a recurrence of the dispute was more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (emphasis in original).

"Election issues are among those most frequently saved from mootness by this exception." *Connor*, 323 F.3d at 691 (internal quotations omitted). Although MFA terminated *by operation of law* as a campaign committee for the 2014 election, it still exists as a section 527 political organization and a nonprofit corporation in good standing in Missouri. Its corporate purpose is the "education of general public on issues concerning fiscal responsibility." *Cf. Zwickler*, 394 U.S. at 109 (finding no "case or controversy" where the plaintiff's "sole concern was literature relating to the Congressman" who had taken a position in the judiciary and "it was most unlikely that the Congressman would again be a candidate for Congress"), *distinguished by Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2344 (2014) (finding standing for advocacy organizations because their focus was on broader issues "not on the voting record of a single candidate"). Post-election, in Answer to the Court's Order to Show Cause, MFA alleged it "will once again be harmed by [section 130.011(8)] . . . if and when it chooses to support or oppose the qualification and passage of one or more particular ballot measures in future elections." "[A]ny number of events . . . might cause [the committee] to become involved in a state race within thirty days of an election." *See id.* at 692 (citing a candidate's death, polls that "might reveal a closer race than expected," new information "or effective advertising [that] could drastically alter public opinion in the weeks before an election," and trends "in other races [that] could elevate the importance of races with less clear outcomes"). To

participate in future elections, MFA must re-form as a campaign committee.[4] And, it must face the specter of section 130.011's formation deadline and MEC's policies on fees. *Cf.* **Super Tire Eng'g Co. v. McCorkle**, 416 U.S. 115, 122 (1974) ("[T]he challenged governmental activity in the present case is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties."), *as construed in* **Weinstein v. Bradford**, 423 U.S. 147, 148 (1975) ("Even though the particular strike which had been the occasion for the filing of the lawsuit was terminated, the Court held that it was enough that the petitioner employer showed 'the existence of an immediate and definite governmental action or policy that has adversely affected and continues to affect a present interest'").

The district court did not err in concluding that the case is not moot.

IV.

The district court dismissed MFA's claims as not ripe. MFA maintains that its challenge to the 30-day formation deadline is ripe for review. Ripeness is reviewed de novo. **Parrish v. Dayton**, 761 F.3d 873, 875 (8th Cir. 2014).

The ripeness doctrine prevents courts "through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also [protects] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." **Connor**, 323 F.3d at 692, *quoting* **Abbott Labs. v.**

---

[4]The MEC stresses *Connor*'s reference to this continuing-committee provision as a "registration deadline." *See* **Connor**, 323 F.3d at 693. MFA believes that the similar campaign-committee provision is a "formation deadline." These labels summarize the parties' contrasting views of the "committee shall be formed" deadline—an issue for consideration on the merits.

*Gardner*, 387 U.S. 136, 148-49 (1967). To decide ripeness, courts consider: "(1) the hardship to the plaintiff caused by delayed review; (2) the extent to which judicial intervention would interfere with administrative action; and (3) whether the court would benefit from further factual development." *Id.* at 692-93. "The touchstone of a ripeness inquiry is whether the harm asserted has matured enough to warrant judicial intervention." *Parrish*, 761 F.3d at 875.

In *Connor*, this court addressed the statute for continuing committees, which then imposed a 30-day formation deadline. *Connor*, 323 F.3d at 693, *citing* **§ 130.011(10) RSMo 2000** (30-day time-limit, later amended to 60 days). This court concluded that a continuing committee's claim was not ripe because it presented neither evidence "on the issue of fees" nor pursued an advisory opinion from the MEC or a temporary restraining order. *Id.* at 693-94. This court explained that how the MEC handles the fees for failing to file before the 30-day window has a significant impact "on our constitutional scrutiny of section 130.011(10)." *Id.* at 693. Without fee evidence or a request for an advisory opinion or a restraining order, the committee "may, in fact, discover that no real threat of enforcement exists at all." *Id.* "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Id.*, *quoting Texas v. United States*, 523 U.S. 296, 300 (1998).

Eleven years later, in 2014, MFA challenged section 130.011(8), which has a formation deadline similar to that in *Connor*. *See* **§ 130.011(10) RSMo 2000** (30-day time limit, later amended to 60 days) (stating a continuing committee "shall be formed no later than thirty days prior to the election for which the committee receives contributions or makes expenditures."). Unlike the committee in *Connor*, MFA presented evidence of the MEC imposing fees on committees for not complying with the formation deadline. In one consent order, the MEC imposed a $1,000 fee on a continuing committee, listing as a separate violation "failing to form as a committee more than sixty days prior to the April 2013 election" (in addition to not timely filing

-10-

an organizational statement).  *Missouri Ethics Comm'n v. Taxpayer Protection PAC*, No. 13E060 (Feb. 18, 2014) (Consent Order), *available at* http://mec.mo.gov/Scanned/CasedocsPDF/18669.pdf.  In the second consent order, the MEC imposed a $3,100 fee on a continuing committee for "forming as a committee less than sixty days prior to an election" (among other violations).[5] *Missouri Ethics Comm'n v. West*, No. 14E091 (Oct. 8, 2014) (Consent Order), *available at* http://mec.mo.gov/Scanned/CasedocsPDF/22110.pdf.  The MEC's policy on imposing fees for not meeting the formation deadline is clear, and the record is now adequately developed.  *See Connor*, 323 F.3d at 693 (where the committee presented no evidence "on the issue of fees").

The touchstone of ripeness is the harm asserted by MFA.  MFA asserts the harm of self-censorship, based on its compliance with section 130.011(8).  *See Arizona Right to Life Political Action Comm.*, 320 F.3d at 1007 n.6 (holding "our conclusion that ARLPAC has suffered actual harm dispenses with any ripeness concerns.").  MFA's case is ripe for review.

\* \* \* \* \* \* \*

The dismissal of MFA's claims is reversed, and the case remanded for proceedings consistent with this opinion.

---

[5]In its verified answer, the MEC says that it negotiates payment of a fee with the treasurer of a campaign committee.  The consent orders show that the MEC negotiates payment of part of the fee (about 10 percent).  The remainder of the fee is then stayed until "any further violation of the campaign finance laws under Chapter 130, RSMo, within the two-year period from the date of this order . . . ."

ARNOLD, Circuit Judge, dissenting.

The 2014 election has come and gone, MFA's election committee has dissolved, and the ballot measure for which MFA's election committee was created to support has passed. MFA and the court nonetheless maintain that MFA has carried its burden to demonstrate an ongoing Article III case or controversy. Because I believe that this case is moot, that its challenges to future disputes are unripe, and that MFA lacks standing to obtain prospective equitable relief, I respectfully dissent.

Article III requires that a plaintiff's personal interest in the litigation must continue throughout the life of the case, otherwise the case is moot. *See Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 691 (8th Cir. 2003). The court draws on *Connor* to hold that MFA's claims were not moot because they were capable of repetition yet would evade review. Claims are "capable of repetition yet evading review" only when "there is a reasonable expectation that the same complaining party will be subject to the same action again." *Id.* MFA, however, provides no evidence that it will participate in a future election, much less create an election committee within 30 days of one. The very nature of the election committee in *Connor*, a continuing committee, suggested future participation because continuing committees do not terminate by operation of law. *See* Mo. Rev. Stat. § 130.011(10). Such a committee also tends to focus on issues that recur in different elections, such as the pro-life concerns of the committee in *Connor*.

MFA's election committee, however, is a campaign committee that, as the court itself recognizes, dissolved by operation of law shortly after the 2014 election. *See* Mo. Rev. Stat. § 130.011(8). It advocated (successfully) for the passage of a particular ballot measure and filed a termination statement. Unlike the record in *Connor*, the record here contains no evidence that the committee at issue will continue to operate or regenerate to participate in future elections, nor is there evidence that the ballot measure for which MFA successfully advocated will be the

-12-

subject of a future election. Because MFA did not "make a reasonable showing that [it] will again be subjected to the alleged illegality," *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983), its claims are not capable of repetition yet evading review. So they are moot.

I respectfully disagree with the court's reliance on MFA's allegation that the formation requirement will harm MFA "if and when it chooses to" participate in another election. Not only is the allegation not evidence, this "some day" intention is much too speculative to overcome mootness. *See Bernbeck v. Gale*, No. 15-1983, 2016 WL 3769481, at *3 n.3 (8th Cir. July 14, 2016). The court's reliance on *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115 (1974), is also misplaced. *Super Tire* involved a state law that made striking workers eligible for welfare programs. Even though the strike in question ended while the litigation was pending, the state law continued to affect the interests of the parties because, as the Supreme Court explained one year after deciding *Super Tire*, the parties were engaged in "cyclically recurring bargaining," *Weinstein v. Bradford*, 423 U.S. 147, 148 (1975) (per curiam), and the law's favorable effect on the employees altered the parties' bargaining positions. *See Super Tire*, 416 U.S. at 124. The state law therefore had an ongoing, continuous, and certain effect. This case more closely resembles *Weinstein*, where the Supreme Court held that a former state prisoner's challenge to the state's parole procedures was moot because he had been released from prison and thus no longer had a present interest in parole policies. *Id.* at 147–48. By providing no evidence of an intent to regenerate for future elections, MFA has not demonstrated a presently affected interest.

I suggest further that the court errs by concluding that MFA's claims are not moot because the MEC has thus far only declined to penalize MFA. It is unclear to me how the MEC could penalize a campaign committee long after it has dissolved, and the two consent orders that the court identifies as showing an imminent threat of a penalty involve penalties levied against continuing committees, which do not

dissolve by operation of law. Nothing in the record shows that MEC actually penalizes defunct campaign committees for late formation or suggests how it could even do so.

MFA's claims are also unripe. Ripeness requires an examination of the fitness of issues for judicial determination and the hardship to the parties when the decision of a case is deferred. *Parrish v. Dayton*, 761 F.3d 873, 875 (8th Cir. 2014). The fitness consideration "safeguards against judicial review of hypothetical or speculative disagreements," and the hardship consideration deals with whether delayed review would work a significant practical harm on the plaintiff. *Id.* This harm must be "certainly impending." *Id.* at 876. Claims are not ripe when they rest on "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* at 875–76.

MFA's claims for prospective equitable relief depend entirely on speculation. Delayed review will not harm MFA because it has given no evidence of an intent to regenerate its election committee for future elections. In no sense is any injury "certainly impending." Unlike *281 Care Committee v. Arneson*, 638 F.3d 621, 631 (8th Cir. 2011), upon which the court relies, MFA will not suffer harm "at defined points" in the future because it has provided no evidence of an intent to act in the future. And the fact that it may have been harmed previously does not license it to seek prospective equitable relief ad infinitum, and the court errs in apparently concluding otherwise.

In *Golden v. Zwickler*, the Supreme Court confronted a First Amendment challenge to a New York law barring distribution of anonymous literature in connection with an election campaign. 394 U.S. 103, 104–05 (1969). The plaintiff was convicted (and thus already harmed) under the law for distributing literature targeting a particular Congressman running for re-election in 1964. The First Amendment challenge, filed after the 1964 election and the reversal of the plaintiff's

conviction, alleged that the same Congressman would run in 1966, that he had been a political figure for many years, and that the plaintiff intended to continue distributing such literature. After the case was filed, the Congressman accepted a position in the New York judiciary, so the Court concluded that it was unlikely that the Congressman would seek re-election, precluding a finding that there was sufficient immediacy and reality, so the Court lacked Article III jurisdiction. Because, moreover, there was no upcoming re-election campaign, "it was wholly conjectural that another occasion might arise when [plaintiff] might be prosecuted for distributing the handbills referred to in the complaint," and his assertion that the former Congressman could run again was "hardly a substitute for evidence that this is a prospect of 'immediacy and reality.'" Constitutional questions, even First Amendment ones, must emanate from a specific live grievance. *Id.* at 109–10. The Court's observations in *Golden* apply here with equal force.

Relatedly, MFA did not prove an actual, imminent injury that is not conjectural or hypothetical, *Mo. Roundtable for Life v. Carnahan*, 676 F.3d 665, 672 (8th Cir. 2012), so it lacks standing. To have standing to raise a First Amendment challenge to a state statute, "the plaintiff needs only to establish that he would like to engage in arguably protected speech, but" the statute in question significantly discourages him from doing so. *281 Care Comm.*, 638 F.3d at 627. The decision to refrain from speaking in light of the relevant statute must be objectively reasonable, which requires the plaintiff to demonstrate "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *Id.*

The court concludes that MFA was harmed by its self-censorship. It seems to me that MFA's self-imposed silence, if any, was not objectively reasonable. We recognized in *Connor*, when construing a virtually identical formation requirement, that the requirement "does not, on its face, limit issue or express advocacy." *Connor*, 323 F.3d at 693. In fact, MFA's proposed construction of the relevant statute borders

-15-

on the fanciful. Life is risky, particularly political life, and President Truman's aphorism about the heat and the kitchen surely has a special resonance in Missouri campaigns. As Mr. Justice Cardozo remarked in a different but similar context, "the timorous may stay at home." *Murphy v. Steeplechase Amusement Co.*, 250 N.Y. 479, 483, 166 N.E. 173, 174 (1929). And MFA's self-imposed blackout does nothing to avoid a penalty; it could have been assessed a penalty whether it was actively speaking or keeping quiet: The challenged portion of the statute concerns only MFA's formation, so whatever MFA did (or did not do) after it formed does not help resolve the standing inquiry.

Finally, "[t]o have Article III standing to seek prospective relief, plaintiffs must show they are likely to suffer future injury that will be remedied by the relief sought." *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006). "Past exposure to illegal conduct" will not suffice absent present adverse effects. *Id.* Past wrongs are merely evidence showing the existence of a real and immediate threat of repeated injury. As with the chokeholds in *Lyons*, MFA has not shown a real and immediate threat of future harm that justifies prospective relief. "Absent a sufficient likelihood that [it] will again be wronged in a similar way, [MFA] is no more entitled to an injunction than any other citizen of [Missouri]." *Lyons*, 461 U.S. at 111. If MFA wants to vindicate what happened to it in 2014, a claim for damages would be more appropriate. *See id.* at 105, 111.

The court gives short shrift to MFA's lack of plans for participating in future elections. Since MFA has not demonstrated the existence of an Article III case or controversy, I respectfully dissent from the court's opinion and would affirm the district court's judgment.

—————————————————