# United States Court of Appeals
## For the Eighth Circuit

_____

No. 23-1374
_____

Brooke Henderson; Jennifer Lumley,

*Plaintiffs - Appellants*,

v.

Springfield R-12 School District; Board of Education, of the Springfield R-12 School District; Grenita Lathan,

*Defendants - Appellees*,

Martha Doenning,

*Defendant*,

Yvania Garcia-Pusateri; Lawrence Anderson,

*Defendants - Appellees*.

------------------------------

Americans for Prosperity Foundation; Alliance Defending Freedom; Foundation for Individual Rights and Expression; Defense of Freedom Institute for Policy Studies; Reason Foundation; American Civil Liberties Union of Missouri; State of Missouri; State of Arkansas; State of Georgia; State of Idaho; State of Iowa; State of Kansas; State of Kentucky; State of Montana; State of Nebraska; State of North Dakota; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of Virginia; State of West Virginia; Institute for Free Speech; Manhattan Institute; Parents Defending Education; Pacific Legal Foundation; Cato Institute; Center of the American Experiment; Goldwater Institute; Kansas Justice Institute; Mississippi Justice Institute; Show Me Institute; America First Legal Foundation;

Hamilton Lincoln Law Institute; Mountain States Legal Foundation; Texas Public Policy Foundation,

*Amici on Behalf of Appellant(s)*,

Missouri School Boards' Association,

*Amicus on Behalf of Appellee(s)*.

_____

No. 23-1880

_____

Brooke Henderson; Jennifer Lumley,

*Plaintiffs - Appellants*,

v.

Springfield R-12 School District; Board of Education, of the Springfield R-12 School District; Grenita Lathan,

*Defendants - Appellees*,

Martha Doenning,

*Defendant*,

Yvania Garcia-Pusateri; Lawrence Anderson,

*Defendants - Appellees*.

------------------------------

Americans for Prosperity Foundation; Alliance Defending Freedom; Foundation for Individual Rights and Expression; Defense of Freedom Institute for Policy Studies; Reason Foundation; American Civil Liberties Union of Missouri; State of

-2-

Missouri; State of Arkansas; State of Georgia; State of Idaho; State of Iowa; State of Kansas; State of Kentucky; State of Montana; State of Nebraska; State of North Dakota; State of South Carolina; State of Tennessee; State of Texas; State of Utah; State of Virginia; State of West Virginia; Institute for Free Speech; Manhattan Institute; Parents Defending Education; Pacific Legal Foundation; Cato Institute; Center of the American Experiment; Goldwater Institute; Kansas Justice Institute; Mississippi Justice Institute; Show Me Institute; America First Legal Foundation; Mountain States Legal Foundation; Texas Public Policy Foundation,

*Amici on Behalf of Appellant(s)*,

Missouri School Boards' Association,

*Amicus on Behalf of Appellee(s)*.
_____

Appeals from United States District Court
for the Western District of Missouri - Springfield
_____

Submitted: February 15, 2024
Filed: September 13, 2024
_____

Before LOKEN, COLLOTON,[*] and KELLY, Circuit Judges.
_____

COLLOTON, Circuit Judge.

In 2020, the Springfield R-12 School District required its employees to attend "equity training." Two employees who attended the training sued the school district and several school officials under 42 U.S.C. § 1983. The plaintiffs alleged that

_____

[*]Judge Colloton became chief judge of the circuit on March 11, 2024. *See* 28 U.S.C. § 45(a)(1).

-3-

during the training, the defendants compelled them to speak as private citizens on matters of public concern, and engaged in viewpoint discrimination in violation of the First and Fourteenth Amendments. The district court granted summary judgment for the school district on the ground that the plaintiffs did not suffer an injury in fact and thus lacked standing to sue. The court also found that the lawsuit was frivolous and awarded attorney's fees to the school district. The plaintiffs appeal. Because we agree that the plaintiffs did not establish an injury in fact, we affirm the dismissal. We conclude, however, that the fee award was unwarranted and reverse that portion of the judgment.

I.

During the 2020-21 school year, the school district required employees to attend a presentation entitled, "Fall District-Wide Equity Training." Attendees were paid for their time and received professional-development credit.

The school district provided in-person and virtual training. At the in-person training, school officials instructed the attendees on how to become "Anti-Racist educators, leaders and staff members." The district defined "anti-racism" as "the work of actively opposing racism by advocating for changes in political, economic, and social life." The presenters cautioned that actions like practicing color-blindness and remaining silent about racism perpetuated white supremacy. The presenters stated, "We want to stress that we are not calling you as an individual a white supremacist. That being said, certain actions or statements . . . can support that structural system of white supremacy." The presenters also displayed an "Oppression Matrix" that categorized various social groups as a privileged, oppressed, or border group. For example, within the category of race, the matrix identified white people as a privileged social group, biracial people as a border group, and Asian, Latina/o, black, and native people as oppressed social groups. At the virtual training, the school district provided similar instruction.

-4-

Some employees were also required to complete online modules in which they watched videos, read articles, and answered multiple-choice questions relating to equity and diversity. For example, one question asked: "When you witness racism and xenophobia in the classroom, how should you respond?" Employees could select one of two options: (1) "Address the situation in private after it has passed"; or (2) "Address the situation the moment you realize it is happening." The module deemed the second option the correct answer. If the employee selected the first option, then a message appeared explaining why the choice was "incorrect." To complete the module, employees had to select the "correct" answer.

The training sessions were interactive. At the in-person training, attendees were asked to speak with one another about specific prompts related to the presentation's content. In the online training, participants were similarly required to speak with other virtual attendees. Both training sessions included an exercise called "Four Corners," in which attendees had to hold up a sign stating whether they agreed or disagreed with various prompts, such as "I believe my students or staff feel safe in Springfield" and "I believe [the school district] provides an engaging, relevant and collaborative learning and working environment.

At both training sessions, instructors displayed a slide entitled "Guiding Principles" in which one line read: "Be Professional – Or be Asked to Leave with No Credit." No attendee was asked to leave, denied pay, or refused credit because of his or her conduct during the sessions. No employee discipline resulted from these sessions.

Brooke Henderson attended the virtual training. Henderson is a Section 504 Process Coordinator. At the training, Henderson expressed her view that Kyle Rittenhouse acted in self-defense during a Black Lives Matter protest in 2020. The presenter responded that Henderson was "confused" and "wrong." Henderson alleges that after this dialogue with the presenter, she stopped speaking out of fear that she

would be asked to leave for being unprofessional. She also alleges that during the "Four Corners" exercise, she responded that she agreed with some prompts solely because she feared that if she disagreed, she would be asked to leave without receiving credit or pay. Henderson also completed the virtual modules. She alleges that she selected answers with which she did not agree so that she would receive credit for the training.

Jennifer Lumley attended the in-person training. Lumley is a secretary. At the training, Lumley stated that she did not believe that all white people were racist, and that people of other races could be racist. She shared a personal anecdote about her niece-in-law, a black woman who married a white man, and how "some black people had told her she did not 'count' as black anymore." The presenter responded that black people could be prejudiced, but not racist. Lumley also stated that she did not believe that she was privileged because she grew up in a low-income household. The presenter responded that Lumley "was born into white privilege." Like Henderson, Lumley alleges that after this interaction, she stopped speaking because she feared that she would be asked to leave.

In 2021, the plaintiffs sued the school district and several district employees. The plaintiffs alleged that in the training sessions and online modules, the defendants compelled them to speak at times and chilled their speech at other times, in violation of the First and Fourteenth Amendments. The plaintiffs also alleged that the requirement to participate in the equity training program constituted an unconstitutional condition of employment.

The defendants moved for summary judgment and argued that the plaintiffs lacked standing because they did not establish an Article III injury. The district court agreed, granted the motion, and invited the defendants to move for attorney's fees under 42 U.S.C. § 1988. When the defendants moved for fees, the district court granted the motion and awarded fees of $312,869.50 against the plaintiffs. The

plaintiffs appeal. We review a grant of summary judgment *de novo*, viewing the facts in the light most favorable to the plaintiffs.

## II.

No matter how passionately a plaintiff believes in her position or how salient her cause may be, a federal court has jurisdiction only if she has standing to sue under case-or-controversy requirement of Article III of the Constitution. To demonstrate Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A plaintiff who invokes federal jurisdiction must support each element "in the same way as any other matter" on which it bears the burden of proof. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). To defeat a motion for summary judgment, the plaintiff "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true." *Id.* (citation and internal quotation omitted). The district court concluded that the plaintiffs lacked standing because they were not injured. [R. Doc. 88, at 24]. On appeal, the plaintiffs argue that they suffered two injuries: chilled speech and compelled speech.

Chilled speech can be an injury in fact. *See Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). To establish a chilling injury, the plaintiffs must show that they self-censored to avoid a credible threat of prosecution or other adverse action. *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 794 (8th Cir. 2016). The decision to self-censor in light of the potential penalties "must be objectively reasonable." *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009).

Compelled speech in violation of the First Amendment is also an injury in fact. *Cressman v. Thompson*, 719 F.3d 1139, 1145 (10th Cir. 2013); *see Jacobs v. Clark*

*Cnty. Sch. Dist.*, 526 F.3d 419, 426 (9th Cir. 2008). To trigger an injury based on compelled speech, the governmental entity "must punish, or threaten to punish, protected speech by governmental action that is 'regulatory, proscriptive, or compulsory in nature.'" *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trustees*, 235 F.3d 1243, 1247 (10th Cir. 2000) (quoting *Laird v. Tatum*, 408 U.S. 1, 11 (1972)). Such punishment may come in the form of an "indirect discouragement," such as requiring adherents of a particular political party to wear arm-bands, *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 402 (1950), but it cannot be minimal, subjective, or speculative. *United States v. Ramsey*, 431 U.S. 606, 624 (1977); *Phelan*, 235 F.3d at 1247-48.

The plaintiffs were not directly punished by the school district. Henderson and Lumley received full pay and professional-development credit for attending the training. They were never disciplined for any of their remarks or actions during the training.

The plaintiffs suggest, however, that they were punished because they were "shamed" and "forced to assume the pejorative white supremacist label for their 'white silence.'" They rely on *Gralike v. Cook*, 191 F.3d 911 (8th Cir. 1999), *aff'd*, 531 U.S. 510 (2001), where this court held unconstitutional a Missouri law requiring that state election ballots identify any candidates who opposed or refused to express a view on congressional term limits. We concluded that the law "threaten[ed] a penalty that is serious enough to compel candidates to speak—the potential political damage of the ballot labels." *Id.* at 918. We explained that the labels were "phrased in such a way" that they were "likely to give (and we believe calculated to give) a negative impression not only of a labeled candidate's views on term limits, but also of his or her commitment and accountability to his or her constituents." *Id.* The plaintiffs here argue that by associating silence and dissenting views with white supremacy during the training, the school district imposed a similar punishment.

We decline to adopt the plaintiffs' broad reading of *Gralike*. Unlike the State in *Gralike*, the school district's presenters did not assign an epithet to the plaintiffs akin to a label next to a person's name on an election ballot. Instead, they chose to "stress that we are not calling you as an individual a white supremacist," while explaining their view that "certain actions or statements . . . can support that structural system of white supremacy." Nor did the training program "threaten a penalty" comparable to the "political damage" inflicted on candidates who disfavored term limits or remained silent on the issue in *Gralike*. The plaintiffs were required to endure a two-hour training program that they and others thought was misguided and offensive. But they were not forced to wear an arm-band classifying them as white supremacists or to suffer any comparable penalty.

The plaintiffs also argue that the defendants indirectly discouraged them from remaining silent or voicing dissenting views, both during the training sessions and in their private lives. To establish an injury from chilled or compelled speech based on the school district's indirect discouragement, the plaintiffs must show that their fear of punishment was credible and not merely speculative. *Zanders*, 573 F.3d at 594; *see C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 189 (3d Cir. 2005). The plaintiffs rely primarily on the presenters' guidance to "Be Professional – Or be Asked to Leave with No Credit." They also refer to statements by the presenters telling attendees to "speak [their] truth," "turn and talk" to nearby colleagues, and share thoughts with the group.

We conclude that the plaintiffs' fear of punishment was too speculative to support a cognizable injury under the First Amendment. While the presenters warned that unprofessional conduct during the session could result in an attendee receiving no credit, they never said that expressing opposing views or refusing to speak was "unprofessional." The plaintiffs' reliance on *Speech First, Inc. v. Cartwright*, 32 F.4th 1110 (11th Cir. 2022), is thus misplaced. In *Cartwright*, the court concluded that a university's policy on "bias-related incidents" objectively chilled speech in part

because the team responsible for investigating these "incidents" could refer students for discipline, even if the team could not directly punish students. *Id.* at 1122-24. Critically, the university stated that the team would investigate, monitor, and refer students for discipline *because of* the students' speech. *Id.* at 1117. Here, the school district's presenters did not state or insinuate that an employee's silence or dissenting views would be considered "unprofessional" and a basis to deny credit for attendance at the training.

To the contrary, the evidence shows that when the plaintiffs and others expressed views different from those of the school district, they received pushback from the trainers on the substance, but they were not asked to leave, and they were not called unprofessional. Attendees other than the plaintiffs largely remained silent and exhibited "very low participation." Yet the plaintiffs cite no evidence that anyone was disciplined, denied pay, or refused credit after attending the training. Therefore, the plaintiffs' subjective fear that dissent or silence would be considered "unprofessional" and grounds for denial of credit was too speculative to establish an Article III injury.

The plaintiffs' alleged fear that they would be punished for failing to advocate for the school district's view of "anti-racism" in their personal lives was speculative. They cite the district's definition of "anti-racism" as "the work of actively opposing racism by advocating for changes in political, economic, and social life." They refer to a greeting at the outset of training that referred to "this significant work for our own personal and professional development." But there is no evidence that the presenters purported to dictate what employees could say or do on their own time outside of work. Nor did the trainers communicate that the plaintiffs would be penalized for making particular statements or keeping quiet in their private lives.

Of course, the same conclusions would hold true if the district's training had aligned more closely with the views of the plaintiffs. Suppose the district's "anti-

-10-

racism" training had emphasized that "[o]ur Constitution is color-blind," *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting), that persons should "not be judged by the color of their skin but by the content of their character," Martin Luther King, Jr., I Have a Dream Speech (Aug. 28, 1963), and that "[t]he way to stop discrimination on the basis of race is to stop discriminating on the basis of race." *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 748 (2007). But suppose that some employees believed that practicing color-blindness perpetuated white supremacy, and that society is stratified in accordance with the "Oppression Matrix." So long as these employees, like Lumley and Henderson, were not punished or threatened with punishment for remaining silent or expressing disagreement with the district's program, they could not establish an injury from required attendance at a two-hour color-blind anti-racism training session.

Henderson raises a separate claim based on the requirement that she complete online modules. To receive credit for completing the modules, she eventually had to select the "correct" answers to multiple-choice questions if her first selections were deemed "incorrect." Henderson argues that she was compelled to speak when she selected the answers that she thought the school district would prefer, rather than the answers that she preferred to some questions.

We agree with the district court that in this type of training module, an employee's "selection of credited responses on an online multiple-choice question reflects at most a belief about how to identify the question's credited response." There may be room for debate about whether Henderson lacks an injury or whether she technically was injured but has no claim on the merits—a public employer can require employees to demonstrate as part of their official duties that they understand the employer's training materials. *See Altman v. Minn. Dep't of Corr.*, 251 F.3d 1199, 1203 (8th Cir. 2001) ("[A] public employer may decide to train its employees, it may establish the parameters of that training, and it may require employees to participate."); *cf. Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585

-11-

U.S. 878, 908 (2018) ("Of course, if the speech in question is part of an employee's official duties, the employer may insist that the employee deliver any lawful message."). But we are aware of no authority holding that simply requiring a public employee to demonstrate verbally an understanding of the employer's training materials inflicts an injury under the First Amendment, so we decline to construe Henderson's completion of the modules as an injury in fact.

Because we conclude that the plaintiffs did not establish a cognizable constitutional injury, they also lack standing to pursue their related claim that the school district imposed an unconstitutional condition on their employment. The district court thus did not err by granting summary judgment for the defendants. The plaintiffs have a forum in the democratically accountable local school board where they can present objections to the district's "equity training."

III.

After dismissing the action, the district court found that the plaintiffs' claims were frivolous and awarded attorney's fees of $312,869.50 to the school district. We conclude that the award was an abuse of discretion.

A prevailing defendant in an action under 42 U.S.C. § 1983 may recover attorney's fees from a plaintiff only in limited circumstances: when the claims were "frivolous, unreasonable, or groundless," or "the plaintiff continued to litigate after it clearly became so." *Hughes v. Rowe*, 449 U.S. 5, 14-15 (1980) (internal quotation omitted). Although we held in *Keene Corp. v. Cass*, 908 F.2d 293, 298 (8th Cir. 1990), that a defendant has not "prevailed" when a complaint is dismissed for lack of subject matter jurisdiction, we will assume for the sake of analysis that *CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419 (2016), superseded that holding. *See Raniere v. Microsoft Corp.*, 887 F.3d 1298, 1305-06 (Fed. Cir. 2018).

Even so, we cannot agree with the district court that the claims here were frivolous. The doctrines of compelled speech, chilled speech, and Article III standing are nuanced and often difficult to apply. The parties cite no apposite authority on how those doctrines apply to training of public employees—especially controversial training of the sort at issue here. Constitutional law in this area is unsettled and developing. *See* Martin H. Malin, Janus *and the First Amendment in the Workplace*, 24 Emp. Rts. & Emp. Pol'y J. 9 (2020). The matter of an employee's standing to sue in this context is fairly described as an issue of first impression with room for plausible disagreement, although we ultimately agree with the district court's decision on that issue.

The district court expressed concern that the "political undertones" of the lawsuit "trivialized the important work of the federal judiciary." But plaintiffs long have pressed the limits of the case-or-controversy requirement in disputes relating to issues of the day. *E.g.*, *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013); *Raines v. Byrd*, 521 U.S. 811 (1997); *Allen v. Wright*, 468 U.S. 737 (1984); *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974); *Ex Parte Levitt*, 302 U.S. 633 (1937) (per curiam). It is the judiciary's responsibility to reiterate the properly limited role of the courts in a democratic society, but a plaintiff's unsuccessful effort to push the boundaries does not warrant an award of fees without a stronger showing of frivolity than the defendants presented here.

\* \* \*

For these reasons, we affirm the judgment dismissing the action, but reverse the award of attorney's fees.

_____

-13-